Mark Alan STUTELBERG,
petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. A07–383.

Supreme Court of Minnesota.

Dec. 6, 2007.

Charles L. Hawkins, Minneapolis, MN, for Appellant.

J. Michael Richardson, Assistant County Attorney, Minneapolis, MN, Attorney General, St. Paul, MN, for Respondent.

## OPINION

BARRY G. ANDERSON, Justice.

Appellant Mark Alan Stutelberg was convicted in 1994 of two counts of first-degree murder for the killing of his girlfriend, Holly Schwerzler. On March 30, 2006, appellant filed a petition for postconviction relief and a motion for an evidentiary hearing. The district court summarily denied appellant's petition and motion, concluding that his delay in seeking relief constituted an abuse of judicial process and that the newly discovered evidence he proffers prejudices the State. We reverse the district court's summary denial of appellant's petition and motion and remand for an evidentiary hearing.

The relationship of appellant and Holly Schwerzler began during the summer of 1980. In 1981, appellant was convicted of murder for killing a drug dealer in the course of a robbery.[1] Schwerzler participated in the crime, but, in connection with a plea bargain, she pleaded guilty to aggravated robbery in exchange for testifying against appellant. After appellant's release from prison in 1989, the couple lived together with their son, M.S., in Corcoran, Minnesota. They later moved to Osseo, Hennepin County, where they were living at the time of Schwerzler's disappearance.

Appellant verbally threatened Schwerzler's life on multiple occasions, and M.S. testified that appellant physically abused

---

1. At appellant's trial for the murder of Schwerzler, the district court prohibited the State from revealing that appellant's prior conviction was a homicide.

Schwerzler approximately once a month when they lived together. Many of these incidents of abuse involved appellant attempting to strangle Schwerzler and pulling telephones out of the walls in their Osseo home to prevent her from seeking help. A particularly violent episode occurred in June 1992, a little over two months before Schwerzler's disappearance, in which appellant attempted to strangle and vigorously kicked Schwerzler. In a note she wrote to a coworker, Schwerzler stated that appellant "about killed me this time." Between the June 1992 incident of abuse and Schwerzler's disappearance, Schwerzler lived in the house in Osseo and appellant lived in the adjacent garage.

Schwerzler resolved to end her relationship with appellant in the weeks before her disappearance. In August 1992, she confided in a coworker that appellant was in possession of a trailer that did not belong to him and that she planned to notify the police. She worried, however, that appellant "would kill her * *,* before he would go back to jail." After appellant attempted to strangle M.S. in the week prior to Schwerzler's disappearance, Schwerzler left M.S. with another family and became even more determined to end the relationship. On Saturday, August 29, the police executed a search warrant for evidence of appellant's theft of the trailer, thoroughly rummaging through the house and garage in the course of their search. Later that day, Schwerzler told the police what she knew about the trailer and returned home against the officers' warnings. Until appellant spoke to the police on Monday, August 31, he was unaware that the police had executed a search warrant and instead believed that Schwerzler had broken into the garage.

In a phone conversation on Saturday evening, Schwerzler told her mother that she was packing her belongings. At approximately 4 a.m. on Sunday, August 30, Schwerzler's next-door neighbor woke up, and, looking out her bathroom window, she noticed a man of appellant's height and build in Schwerzler's bedroom. The neighbor went back to sleep but woke up shortly thereafter and saw the man, who also had "the same walk" as appellant, place a bag into a car. After dozing off again, the neighbor woke up and saw the man turn off the light in Schwerzler's bedroom. She watched the man enter the garage, heard the clinking sound of a chain being picked up, and saw him place something into the car. The man retrieved a briefcase from the house and drove away in the car at 5 a.m. The neighbor testified that she had "no doubt" that appellant was the man she saw that morning.

Family members became concerned when Schwerzler failed to appear at a family gathering on Sunday. They visited the house in Osseo that day and found phones ripped out of the walls, packed boxes scattered about the house, and a broken table. The state of the phones was particularly alarming given appellant's practice of ripping phones out of the walls during his abuse of Schwerzler. The family members also observed that Schwerzler's bed was covered with only a mattress pad and a crumpled sheet. An officer had seen a comforter on the bed when he searched the house on August 29.

Schwerzler's family returned to the house over the next two days and found that someone had attempted to repair the phone wires and removed many of the boxes and the broken table. They also found Schwerzler's makeup bag, which she took with her whenever she left home. On Monday, August 31, they found a pile of appellant's clothes in the basement and a pair of jeans and a shirt in the washing machine, and the next day they found Schwerzler's quilt in the dryer. A picture

of the interior of the garage taken by one of Schwerzler's sisters on Tuesday shows a blanket on the floor underneath Schwerzler's comb, an unopened pack of cigarettes, and the dining room telephone. The garage was uncharacteristically clean and had a damp spot on the floor as if it had been washed. Appellant was arrested on Tuesday, September 1, for a parole violation.[2] He repeatedly contradicted himself in his explanations to Schwerzler's family members and to the police regarding his activities on the weekend of Schwerzler's disappearance, when he last saw Schwerzler, and the whereabouts of his truck and Schwerzler's car during that time.[3]

On October 1, 1992, a hunter discovered Schwerzler's body wrapped in a sheet and placed under tree branches in a wooded area in Vasa Township, Goodhue County. Schwerzler's robe, which she wore before and after her showers, was pushed partially behind her, and pieces of her clothing were tied around her neck, wrists, and ankles. An autopsy revealed that the cause of Schwerzler's death was "homicidal strangulation" and that she was already dead when the ligatures around her wrists and ankles were attached.

A number of items found near Schwerzler's body came from the house in Osseo. M.S. identified an iron, a set of weights tied together, and a dumbbell found near the body as items from the house. A small Dirt Devil vacuum cleaner and a trouble light were also found near the body, and M.S. testified that a Dirt Devil vacuum was kept in the house and that appellant had a trouble light in the garage. A chain was found near the body as well. Expert testimony at trial connected, to varying degrees of certainty, (1) a concrete block found near Schwerzler's body with one in the garage; (2) debris found in Schwerzler's car with those concrete blocks; (3) grease on the concrete block found near the body with appellant's grease gun; (4) the weights found near the body with weights in the house in Osseo; and (5) markings on the concrete block found near the body with a scratch on appellant's grease gun. Observing that most of the items found near Schwerzler's body are heavy, the State speculated that appellant intended to submerge the body but found the nearby creek too difficult to reach or the water level too low.

The State and appellant each called an entomologist to testify as to Schwerzler's date of death based on the presence of insects on her body. Both entomologists emphasized that the date of death prediction is an estimate that can be affected by numerous factors. The State's entomologist testified that the evidence was "consistent" with Schwerzler's death occurring on or around Saturday, August 29, but on cross-examination she discovered errors in her calculations that likely affected her conclusion. Appellant's entomologist estimated that Schwerzler's death occurred on or after September 3, when appellant was in police custody.

Robert Edwards, who was imprisoned with appellant prior to the discovery of Schwerzler's body, testified that he overheard appellant tell another inmate, "she's in the woods." But Edwards' testimony was impeached by the testimony of another inmate, who alleged that Edwards encouraged him to testify falsely against ap-

---

**2.** Appellant engaged the police in a standoff, but the district court prohibited the State from introducing evidence of that fact at trial.

**3.** Schwerzler's car was ultimately found near the home of Hans Brenner and Diane Bauer. Bauer claimed that appellant lent her the car, which she abandoned with the keys inside upon learning of Schwerzler's disappearance.

pellant and that Edwards has a reputation as a liar. Additionally, Walter Poepping, who was imprisoned with appellant prior to appellant's trial, testified that appellant asked him to locate witnesses who would testify on appellant's behalf in exchange for payment. Appellant provided Poepping with a letter instructing the witnesses to testify that they saw Schwerzler on the night of Tuesday, September 1, 1992. Appellant's fingerprints were found on the letter, and a handwriting expert testified that appellant was the author. The police directed Poepping to place appellant in contact with an undercover detective, and they recorded multiple conversations in which appellant advised the detective how she should testify. Poepping admitted at trial that he received a reduced sentence in exchange for his assistance to the authorities.[4]

Jurors heard a number of other recordings in which appellant, calling from a prison telephone, asked individuals to perjure themselves on his behalf. Appellant told one person, "I want to make sure everything's covered from A to Z and back again," and he told another person that "I want to cover my ass for those two days." In an attempt to convince his brother to testify, appellant pleaded, "[E]verybody lies anyway, you know what I mean"? Handwriting analysis also confirmed that appellant wrote a letter to a man referred to as "Big Larry," in which appellant directed him to testify that he saw Schwerzler on the afternoon of Sunday, August 30, 1992. Appellant expressed concern in one of his phone conversations that Larry perhaps had not received the letter and that "Larry's the only one out of * * * my master plan."

Several witnesses testified on appellant's behalf. One of appellant's former prison roommates testified that he wrote a letter to appellant on November 10, 1992, in which he revealed that he overhead Randy Masica, a fellow inmate, say that he saw Schwerzler on Tuesday, September 1. The letter was admitted into evidence along with an envelope postmarked November 12, 1992. Randy Masica and another witness, both former employees of appellant, testified that they saw Schwerzler on September 1.

On May 4, 1993, appellant was indicted on two counts of first-degree murder: premeditated murder under Minn.Stat. § 609.185(1) (2000) and pattern of domestic abuse murder under Minn.Stat. § 609.185(6) (1994). In August 1993, the district court authorized the State not to disclose two of its witnesses until shortly before trial, finding that they "may indeed be subject to physical harm or coercion if the information relative to these individuals presently in possession of the prosecution is disclosed to the defendant." The witnesses had "expressed fear for their lives if their identities were disclosed prior to trial," and one of them had allegedly received death threats through mutual acquaintances of that witness and appellant. Appellant was convicted on both counts of first-degree murder and sentenced to consecutive life sentences.[5]

Appellant appealed his conviction in February 1995, and the following November he requested a stay of his direct appeal process to pursue evidentiary hearings in the district court. After authorizing two extensions of time for filing a brief, we dismissed appellant's appeal

---

4. Poepping also informed the police that appellant told him that he dumped Schwerzler down a dirt road in a wooded area, but the State did not solicit this testimony at trial.

5. Neither party has raised the issue of the interaction of these convictions with Minn. Stat. § 609.04 (2006), and in light of our remand we do not reach the issue here.

for failure to file a brief and denied his motion to stay the appeals process. Our dismissals were "without prejudice to filing of a petition for post-conviction relief in the district court."

In 2004 and 2005, appellant secured affidavits from Robert Edwards, Walter Poepping, and Diane Bauer which appellant claims entitle him to a new trial. Edwards states in his affidavit that he testified falsely at appellant's trial in pursuit of a lenient sentence, Poepping states in his affidavit that he was paid by the authorities for assisting with the investigation and that appellant told him he was innocent, and Bauer states in her affidavit that the authorities coerced her to tell them "what [they] wanted to hear even though [she] knew it wasn't right."

Appellant filed a petition for postconviction relief and a motion for an evidentiary hearing on March 30, 2006, and he filed a memorandum in support of his petition in August 2006. On December 19, 2006, shortly after receiving the State's memorandum in opposition to postconviction relief and before appellant filed a response, the district court denied appellant's petition and motion. The district court concluded that appellant's delay in moving for relief "amounts to an abuse of judicial process," reasoning that appellant "offers no excuse, explanation, or rationale for his prolonged delay in seeking review of his murder conviction of nearly twelve years" and that appellant's newly discovered evidence "cause[s] prejudice to the State." Appellant appealed the district court's decision on February 21, 2007, and he later submitted an affidavit in which he claims that he diligently pursued relief and that his delay was attributable to the pro bono status of his attorney and investigator.

## I.

■ On appeal from a summary denial of a petition for postconviction relief, we "determine[ ] only whether sufficient evidence exists to support the lower court's findings." *Roby v. State*, 547 N.W.2d 354, 356 (Minn.1996). We will disturb the postconviction court's decision only if the court abused its discretion, but we review the postconviction court's legal determinations de novo. *Leake v. State*, 737 N.W.2d 531, 535 (Minn.2007). A petitioner is entitled to an evidentiary hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2006). A petitioner's allegations "must be 'more than argumentative assertions without factual support.'" *Leake*, 737 N.W.2d at 535 (quoting *Hodgson v. State*, 540 N.W.2d 515, 517 (Minn. 1995)). In the postconviction court, the petitioner has the burden of proving the truth of the facts set forth in the petition by a fair preponderance of the evidence. Minn.Stat. § 590.04, subd. 3 (2006).

■ Because the length of appellant's delay in filing his petition is not as great as the length of delay in most cases in which we have upheld the denial of a petition on untimeliness grounds, the newly discovered evidence proffered by appellant causes little or no prejudice to the State, and appellant has not received appellate review of his claims, the district court erred in failing to grant an evidentiary hearing under the unique facts of this case. We therefore reverse and remand for an evidentiary hearing.

### Length of Delay

■ A petitioner's delay in filing a petition for postconviction relief is generally one factor we consider when determining whether relief should be granted. *Rairdon v. State*, 557 N.W.2d 318, 322 (Minn.1996). But "a delay that is deliberate and inexcusable constituting an abuse

of the judicial process * * * is sufficient grounds to justify denial of relief solely on the basis that the petition is untimely." *James v. State,* 699 N.W.2d 723, 728 (Minn.2005). In *McMaster v. State,* for example, we affirmed the denial of a petition for postconviction relief because the petitioner's claims were meritless and his 15–year delay constituted "an abuse of the judicial process." 551 N.W.2d 218, 218–19 (Minn.1996). But we also emphasized in *McMaster* that the petitioner admitted that his delay was a deliberate attempt to avoid extradition to Canada, where he thought he would face capital punishment for murders he committed there. *Id.* at 219. Likewise, in *Gaulke v. State,* we affirmed the denial of a petition for post-conviction relief because the petitioner, who waited 25 years to file his petition after allegedly learning of new evidence, "did not act with due diligence in seeking relief." 296 Minn. 487, 487, 206 N.W.2d 652, 652 (1973). *See also Sutherlin v. State,* 574 N.W.2d 428, 433 (Minn.1998) (deciding to evaluate the merits of petitioner's claims although his 10–year delay "alone may be sufficient grounds" for dismissing his petition); *Black v. State,* 560 N.W.2d 83, 85–86 (Minn.1997) (holding that although the petitioner's claims were either procedurally barred or meritless, the 18–year delay between his conviction and the filing of his petition was "a sufficient basis for affirming" the district court's denial of the petition); *Houghton v. State,* 296 Minn. 494, 495, 207 N.W.2d 63, 64 (1973) ("We are of the opinion that, if the matter has not been rendered moot by petitioner's unconditional discharge, it was proper for the trial court to deny relief where over 46 years elapsed before petitioner asserted his rights.").

 The State emphasizes that appellant waited more than 11 years after his conviction and more than 10 years after his direct appeal was dismissed to file his petition for postconviction relief. But the filing delay here is not as great as the delay in most cases in which we have upheld the denial of a petition on untimeliness grounds. The length of the petitioner's delay in *Sutherlin* is similar to the length of appellant's delay, but in *Sutherlin* we merely posited that the petitioner's delay *"may be* sufficient grounds" for dismissing the petition and proceeded to evaluate the petitioner's claims on their merits. *Sutherlin,* 574 N.W.2d at 433 (emphasis added). Furthermore, the length of appellant's delay is not as great as the length of the petitioner's delay in *McMaster,* and in that case the petitioner admitted that his delay was intentional. 551 N.W.2d at 219. Appellant, in contrast, claims that his delay was unintentional and that he has diligently pursued relief. While the delay here is troublesome, it does not conclusively show that appellant is entitled to no relief.

### Prejudice to the State

 The prejudice to the State caused by a petitioner's delay is also a relevant factor in determining whether relief should be granted. *See Opsahl v. State,* 677 N.W.2d 414, 425 (Minn.2004); *Wensman v. State,* 342 N.W.2d 150, 151 (Minn.1984). The district court held that the affiants' "recanted and refashioned statements * * * cause prejudice to the State, as the statute of limitations for perjury has expired." According to the district court, "Any new testimony offered by these former State witnesses is free of impunity and the State may not pursue any actions for perjury against them."

The expiration of the perjury statute of limitations was the sole basis for the district court's finding of prejudice, and we reject the court's assessment of that issue. We have never held that the three-year

statute of limitations for perjury, Minn. Stat. § 628.26(k) (2006), is also the statute of limitations for postconviction relief based on recanted testimony, which would be the practical effect of adopting the district court's reasoning. We further reject the district court's reasoning because, although the witnesses could not be prosecuted for false statements made at trial, they could be prosecuted for false statements made in their affidavits. *See* Minn. Stat. § 609.48, subd. 1 (2006). Consequently, the prejudice to the State allegedly caused by the expiration of the perjury statute of limitations does not conclusively show that appellant is entitled to no relief.

### Absence of Appellate Review

■ Finally, but perhaps most critically, because we dismissed appellant's direct appeal for failure to file a brief, he has not received appellate review of his claims. "Although there may be extreme cases in which an excessive delay, without excuse, may alone justify denial of postconviction relief, * * * convicted defendants are generally entitled to at least one right of review." *Rairdon,* 557 N.W.2d at 322 (internal citation omitted). Indeed, we have suggested that a petition cannot be barred as untimely where the petitioner has not been heard on appeal. In *Black,* for example, we noted that although excessive delay can be a basis for dismissal, "[a]n exception to this rule is if the petitioner never received a review of his case by an appellate court." 560 N.W.2d at 85. Likewise, we clarified in *Sutherlin* that "[a] lengthy delay in filing a petition for postconviction relief may in itself provide a sufficient basis for affirming the dismissal of the petition *when there has already been a direct appeal.*" 574 N.W.2d at 432 (emphasis added).

We are cognizant of prior cases in which we have relied in part or in whole on untimeliness grounds to uphold a district court's denial of a petition where the petitioner had not received appellate review of his claims. *See McMaster,* 551 N.W.2d at 218–19; *Houghton,* 296 Minn. at 495, 207 N.W.2d at 64; *Gaulke,* 296 Minn. at 487, 206 N.W.2d at 652. But in each of these cases, the petitioner had been granted a hearing.[6] In light of the unique facts of this case, the district court's failure to consider this factor contributes to our conclusion that the district court abused its discretion in denying appellant's petition for postconviction relief and motion for an evidentiary hearing.

### II.

Because the petition, files, and records do not "conclusively show that the petitioner is entitled to no relief," appellant is entitled to an evidentiary hearing. Minn. Stat. § 590.04, subd. 1 (2006). The district court thus abused its discretion in summarily denying appellant's petition for postconviction relief and motion for an evidentiary hearing under the facts and circumstances of this case. We recognize that appellant's burden of proving the truth of the facts set forth in his petition will be especially difficult to meet in light of the overwhelming evidence presented against him at trial and his efforts to suborn perjury. *See* Minn.Stat. § 590.04, subd. 3 (2006) ("Unless otherwise ordered by the court, the burden of proof of the facts alleged in the petition shall be upon the petitioner to establish the facts by a fair preponderance of the evidence."). We do not intimate how the district court should rule on the timeliness or merits of appellant's petition, but only require that

---

**6.** Although not stated in the *McMaster, Houghton,* and *Gaulke* opinions, the appellate briefs in those cases indicate that the petitioners did not receive appellate review of their convictions and that a hearing was held.

an evidentiary hearing be held to consider appellant's claims.

Reversed and remanded for an evidentiary hearing.