James Luther CARLTON, Appellant,

v.

STATE of Minnesota, Respondent.

No. A10–2061.

Supreme Court of Minnesota.

July 18, 2012.

David W. Merchant, Chief Appellate Public Defender, Cathryn Middlebrook, Assistant Public Defender, Saint Paul, MN, for appellant.

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

GILDEA, Chief Justice.

Appellant James Luther Carlton was convicted of first-degree premeditated murder and first-degree murder while committing criminal sexual conduct in connection with the death of Jodi Dover. Carlton filed a notice of direct appeal, which we stayed on May 13, 1996, pending postconviction proceedings in the district court. Carlton neither filed a petition for postconviction relief nor followed through with his direct appeal, and we dismissed his appeal on June 12, 1997. In this case, Carlton appeals the denial of his first petition for postconviction relief, which was filed in Hennepin County District Court on August 10, 2010. Because we conclude that the postconviction court properly denied Carlton's petition, we affirm.

*Initial investigation of Dover's death*

On July 11, 1994, M.R. found her friend, Jodi Dover, dead in Dover's apartment. When Minneapolis Police Sergeant Charles Miles responded to the crime scene, he discovered Dover's body in her bedroom with the blinds closed. Dover was naked, lying face up, with a gag tied around her mouth. Dover's arms were bound behind her back with a ligature made from Dover's underwear. Clotted blood covered Dover's face, and she appeared to have been struck in the forehead. Miles observed a kitchen knife deeply embedded in Dover's neck as well as caked blood and wounds on her chest. Miles saw a pool of blood beneath Dover's neck, droplets of blood on the walls, and blood on the door and floor of the bathroom. The comforter from Dover's bed also had blood on it. Additionally, Miles noted what appeared to be footprints in the blood on the floor.

Miles also observed other potentially relevant items in Dover's apartment. Miles discovered a clock on the bed, an empty condom wrapper underneath the comforter, and a used tampon on the floor. The condom wrapper did not match the unopened condoms found in a dresser in Dover's living room. Jean shorts, a blouse with blood on it, and a pair of blood-soaked boxer shorts lay on the floor. Miles found several glass telephone insulators on a table in Dover's bedroom, and one behind Dover's body with dried blood on it. Underneath the bed, Miles discovered an unopened box containing a .25–caliber semiautomatic pistol. Miles found Dover's pocket book and several credit cards but did not find Dover's driver's license. Miles found a paring knife in the kitchen sink, and two knives near the sink. Miles observed that the two knives near the sink and the knife in Dover's neck appeared to be the same as a fourth knife found in a knife block in the kitchen. Miles also found an unsmoked cigarette near the bedroom. The police collected most of the items from Dover's apartment for testing.

Upon further inspection of Dover's apartment, Miles determined that the front door showed no signs of forced entry, though a small amount of blood was pres-

ent on the edge of the door. The rear door to Dover's apartment was secured by a dead-bolt lock, and appeared undisturbed. The living room, dining room, and kitchen appeared neat and orderly, and there were no indications of a robbery in connection with Dover's death.

Daniel Davis, an assistant medical examiner, conducted a sexual assault examination of Dover's body the same day the body was discovered. Davis testified that he conducted the exam immediately because he was worried about the deterioration of evidence of a sexual assault. Swabs from Dover's oral, vaginal, and anal cavities all tested negative for the presence of sperm and seminal fluid. Davis observed a fresh scrape in Dover's vaginal area that occurred before her death and was consistent with forced vaginal penetration.

Davis also performed an autopsy on Dover. Davis determined Dover had likely been dead more than 1 day, and as many as 3 days before Dover's friend discovered her body. Davis testified that Dover's death was a homicide, and that the knife wound to Dover's neck was the cause of death. This fatal wound was caused by deliberate sawing actions that severed Dover's neck—with the exception of one area of skin that remained bridged on the front of the neck—all the way through to her spine. The knife wound caused Dover to bleed to death.

In addition to the neck wound, Davis determined that Dover had suffered other significant injuries. Davis observed 6 non-fatal stab wounds on the back of Dover's right shoulder and up to 10 blunt-force impact injuries to Dover's face that likely occurred before the fatal neck wound. Davis determined that the impact injuries, which broke Dover's skin and left marks on her skull, were likely inflicted with a glass telephone insulator found near Dover's body. Davis noted that Dover had no knife cuts on her hands or wrists, but he did observe a scratch on her finger and an abrasion on her wrist.

*Carlton's behavior during and after Dover's killing*

On July 11, 1994, while police were investigating Dover's apartment, Carlton and his girlfriend, B.S., arrived at Dover's apartment building, which was also where Carlton was living at the time. Carlton asked a police officer what was going on, and the officer told him there had been a murder upstairs. Carlton and B.S. spoke briefly with the police, and Carlton told them he did not know, and had never even seen, Dover because he had only recently moved into the building.[1]

Police also learned that on July 9, shortly after midnight, Carlton called 911 from a pay phone approximately 5 blocks from Dover's apartment building. An ambulance took Carlton to the emergency room at Abbott Northwestern Hospital, where a doctor examined him shortly before 1:00 a.m. Carlton's chief complaint was that he had been suffering from gastrointestinal problems for several days, including nausea, vomiting, abdominal discomfort, and diarrhea. A nurse at the hospital testified that Carlton had told her he had collapsed at a store earlier that evening. The nurse noticed a bruise on Carlton's chest but did not see any blood on Carlton. During the hospital visit, Carlton admitted to having used crack cocaine earlier that day.

The emergency room doctor found that Carlton had low blood pressure, a slightly elevated body temperature, and was extremely sleepy and not verbally respon-

---

1. Carlton had moved into Dover's apartment building about a week before Dover's body was discovered. Carlton was doing construction work for the building's owner, who was allowing Carlton to stay in the unit directly below Dover without a formal lease.

sive. Lab tests revealed that Carlton had a decreased potassium level, which can be caused by alcohol abuse, dehydration, or insufficient food consumption. The doctor diagnosed Carlton with the flu, and gave Carlton intravenous fluids. The emergency department discharged Carlton at 6:55 a.m. on July 9.

Upon his discharge from the hospital, Carlton called his girlfriend, B.S., told her he had been sick, and asked her to come visit him. B.S. arrived at Carlton's apartment around 3:00 p.m. on July 9. When police originally took B.S.'s statement, she stated that she arrived in Minneapolis on July 8, but when interviewed again, she modified her statement to reflect her July 9 arrival. Because Dover's and Carlton's units each began with the same number, "1016," B.S. accidentally entered Dover's apartment first, but left when she saw women's clothing scattered on the floor and heard Carlton calling to her from outside the building. B.S. testified that she saw nothing unusual in Dover's apartment.

Carlton and B.S. spent the evening at Carlton's apartment watching television. B.S. testified that Carlton was still sick, running a high fever, vomiting, and having diarrhea. That night B.S. slept in the lofted bed in Carlton's apartment while Carlton slept on the couch underneath the bed. After going to bed, B.S. could no longer see or hear Carlton. B.S. slept poorly because noises from upstairs kept waking her. She heard what sounded like heavy boots, a person walking across the floor, somebody throwing something, and a chair screeching across the floor.

When B.S. awoke the next morning, July 10 at 6:00 a.m., Carlton was drying off after taking a shower and no longer appeared sick. Later that day, B.S. noticed what she thought was blood dripping from an overhead light fixture in Carlton's apartment. When she called the pool of "thick," "red" substance to Carlton's atten-

tion, he told B.S. that it was not blood, but instead was cranberry juice. Carlton took the light bulb out of the fixture and wiped the substance away with a rag, and told B.S. that the substance was rust and water. When Carlton and B.S. spoke with the police on July 11, Carlton mentioned the red liquid that had been dripping from his ceiling, explaining to officers that he thought it was a drink spilled at a party. Carlton showed officers the rag he had used to wipe up the substance.

*Further police investigation*

After discovering Dover's body, the police continued their investigation into her death. Officials discovered that Dover was alive on the evening of July 8. At around 5:45 p.m., a check written by Dover was received by a nearby grocery store. Additionally, an employee in the rental office for Dover's apartment building saw Dover carrying groceries home around 6:00 p.m., and saw her again at 7:30 p.m. when she took out her garbage.

The police also interviewed other residents of Carlton and Dover's apartment building. M.T., a neighbor who lived in the apartment across the hall from Dover, and his girlfriend, S.H., testified they were at M.T.'s apartment watching movies on July 8. S.H. heard someone come up the main apartment stairs at around 8:00 p.m. S.H. testified that around 10:30 p.m. she heard rhythmic, thumping sounds that she associated with sexual activity coming from Dover's apartment. About 45 minutes later, S.H. heard an alarmingly loud thumping noise that "sounded scary," causing the two to turn off the movie to listen more closely. The sounds lasted for about 5 minutes and were so forceful that they shook a table lamp in M.T.'s apartment. M.T. testified to the same strange sounds but placed the timeline later in the evening, stating that he heard someone come up the stairs and enter Dover's

apartment around 11:00 p.m., and heard the loud thumping sounds between midnight and 1:00 a.m.

After the noises ceased, M.T. and S.H. heard someone leave Dover's apartment. S.H. waited until she heard footsteps retreating down the stairs and then looked out into the hallway, where she noticed the door to Dover's apartment was ajar. M.T. looked out his window and, from his vantage point, did not see anyone leave the building.

Because there did not appear to be signs of forced entry into Dover's apartment, part of the police investigation focused on which suspects had access to her apartment. At trial, witnesses described Dover as safety conscious. Dover had screened her calls, and was known to make visitors identify themselves before she let them in to her apartment. Dover had also requested that a chain be put on her door for added security. Additionally, Dover stored a gun underneath her bed.

In addition to a master key to all of the apartment units in the building, Dover's landlord kept additional keys to some of the units in a box in the back room of the rental office. One of the two rental office employees testified that she was not sure whether a copy of Dover's key was usually kept in the back room. In the course of the investigation, no law enforcement officials asked either rental office employee to verify whether an extra key for Dover's apartment was kept in the back room, nor were fingerprints taken off the key box. The back room and the box containing keys within the room were both usually unlocked. Though neither employee recalled anyone asking for Dover's key, because the room and box were unsecured, keys were often removed and returned without the employees' knowledge, and the employees frequently left the office unattended. Both employees testified that Carlton occasionally came to the rental office to talk or use the telephone, and was free to come and go as he pleased.

Police also investigated Dover's landlord in connection with Dover's murder. Dover's landlord lived across the street from the apartment building and had a picture window in his home that faced Dover's bedroom. The landlord told police that he was at a resort in Emily, Minnesota, on the weekend of the murder. When the landlord returned home after the weekend, he found the door to his house ajar, and police, suspecting a possible break-in, went to his home to search for fingerprints. A friend of Dover's testified that she and Dover had as many as 10 conversations about the landlord's unwanted advances toward Dover, consisting of him rubbing her shoulders, putting his hands in her hair, and making sexual innuendos toward her. During the course of their investigation, police learned that Dover's landlord smoked cigarettes, but Dover and Carlton did not.

*Police interview Carlton*

As part of their continuing investigation, police again spoke with Carlton on July 13, 1994. During this interview, Carlton contradicted his July 11 statement and he explained that he had, in fact, known Dover. Carlton told police that Dover may have given him an aspirin on July 7, but Carlton said he had never been in Dover's apartment.

Police interviewed Carlton again on August 16, 1994. Carlton again told police that he had been sick the weekend of Dover's death and was hospitalized in the early morning hours of July 9. During this interview, Carlton admitted that his illness was likely related to his use of crack cocaine. Carlton indicated that a gas station employee had called 911 on Carlton's behalf, though 911 records revealed that Carlton himself had called from a convenience store across the street from the iden-

tified gas station. Carlton confirmed his statement from July 13 that he did not know Dover well and never had been in her apartment.

*Search warrants*

After the August 16 interview, police applied for and were granted warrants to search Carlton's body, Carlton's former apartment in Dover's building, and the apartment Carlton moved into following Dover's killing. The warrant application to search Carlton's body contained a number of facts supporting the request for physical evidence. The application indicated that Dover was found dead in her apartment on July 11, 1994; she had been seen alive 3 days earlier; the front door to her apartment was found unlocked; she was safety conscious and would not have allowed a stranger into her apartment; Dover's neighbors heard footsteps entering and exiting Dover's apartment interrupted by strange, loud thumping sounds; blood-soaked boxer shorts were found under the victim; and a medical examiner had concluded that her death was a homicide. Additionally, the application cited the following facts related to Carlton's involvement specifically: Carlton lived directly downstairs from Dover in the same apartment building; Carlton and B.S. had noted blood dripping from the ceiling of Carlton's apartment; B.S. modified the original statement she had given to the police, rendering Carlton without an alibi for July 8, 1994; Carlton admitted to having been to Dover's apartment to get an aspirin after first denying having ever seen Dover; Carlton had a felony criminal sexual conduct conviction and was a suspect in another sexual conduct crime; and investigators had developed a useful footprint from the crime scene. Pursuant to the body warrant, Carlton provided blood, pulled and combed pubic hair, pulled head hair, fingerprint, and footprint samples.

During their investigation of Carlton, the police seized a knife sheath and the light fixture from the apartment Carlton had occupied beneath Dover's unit. The police also seized a Drezack Soungen knife and sheath and a fillet knife and sheath from the apartment Carlton moved to after Dover's killing. At Carlton's trial an employee from a knife store in Roseville, Minnesota, testified that he was familiar with Drezack brand knives, and remembered a couple coming into the store in the summer of 1994 to return a broken Drezack knife like the one found in Carlton's apartment. The employee identified Carlton's girlfriend, B.S., from a photograph as the woman who came into the store. B.S. testified that Carlton was with her when they returned the knife. The couple returned the knife without a receipt. The police contacted the Drezack knife's manufacturer and recovered the broken knife the police thought might have been the one Carlton returned. A wholesale distributor of that type of knife testified that a break like the one present in the recovered knife would likely occur only with misuse of the knife. Forensic testing revealed that the recovered knife did not contain any blood.

Other than the knives, the search of Carlton's two apartments revealed no evidence connecting Carlton to Dover's murder. Police found no men's boxer shorts matching those found at the scene. The apartments contained no condoms, narcotics, or writings referencing the crime. No bloody clothing or other evidence was found in a sweep of the neighborhood immediately after discovery of Dover's body, and police never found Dover's driver's license.

Using the samples obtained from Carlton's person, police identified some of the physical evidence found in Dover's apartment. Though few surfaces in Dover's apartment yielded usable prints, an identi-

fication expert matched Carlton to a fingerprint found on the clock in Dover's bedroom as well as a bloody footprint between Dover's bedroom and bathroom. Laboratory tests eliminated Carlton as the source of the blood on all of the items found in Dover's apartment with sufficient blood to test. But the DNA profile of semen found on the blouse in Dover's apartment and two areas of the comforter matched Carlton's known profile.

### Carlton's arrest and indictment

On August 31, 1994, a warrant was issued for Carlton's arrest. The police were unable to locate Carlton in Minneapolis. They eventually apprehended Carlton in California in early November 1994.

A Hennepin County grand jury indicted Carlton on two counts of first-degree murder for causing "the death of a human being with premeditation and with intent to effect the death of the person," and for causing "the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence, either upon or affecting the person." Minn.Stat. § 609.185(a)(1), (2) (2010). Carlton's jury trial was held between July 5 and July 27, 1995.

### District court's admission of search warrant evidence

The district court admitted, over Carlton's objection, evidence obtained pursuant to the warrant for the search of Carlton's person. The court, in a pretrial memorandum, concluded that the warrant application contained sufficient probable cause such that the evidence obtained from Carlton's body was admissible. The court explained that because there was no sign of forced entry, Carlton living downstairs from Dover gave "reason to believe that the victim and Carlton may have been sufficiently acquainted that Carlton could have been allowed into the victim's apartment and reason to believe that Carlton

could have had the opportunity to have been the perpetrator." The court also explained that Carlton's noting that blood was dripping from the ceiling gave "reason for concern as to why this circumstance was not earlier reported." Finally, the court stated that Carlton's and B.S.'s changes in their original statements to police (that B.S. was with Carlton on July 8, and that Carlton had never seen Dover) gave "reason to believe that Carlton had lied in his statement to the police with respect to when he was with his girlfriend and with respect to his acquaintanceship with the victim and whether he had been to her apartment."

### District court's admission of Spreigl incidents

Additionally, the district court allowed the State, over Carlton's objection, to introduce witness testimony regarding two Spreigl incidents. Carlton argued that the Spreigl incidents were not similar to the circumstances of Dover's death and were therefore inadmissible because they were only minimally relevant and significantly more prejudicial than probative.

The first incident occurred on October 4, 1994, at 2:00 a.m., and involved a 17–year–old victim, K.A., that Carlton had been acquainted with for approximately 2 months. After giving Carlton a ride to the motel where he was staying, K.A. voluntarily entered Carlton's motel room to use drugs. K.A. began injecting herself with what she thought was cocaine, but stopped when she felt an intense burning sensation. Carlton grabbed K.A. by her hair, forced her to the bed, told her he was going to rape her, and threatened to hurt or kill her if she did not cooperate. Carlton held K.A. down and ripped off her shorts and underwear. While holding her down on the bed with his hand over her mouth, Carlton forcibly penetrated K.A.'s vagina with his penis and continued to sexually

assault her for 30 to 45 minutes. After ejaculating, Carlton took K.A.'s keys and fled in her car.

The second incident also occurred on October 4, 1994, and involved a 29–year-old pregnant woman, S.S., whose husband had previously employed Carlton. During Carlton's employment, S.S. had seen Carlton twice. At 8:00 a.m., Carlton knocked on S.S.'s door and told her that he had some work for her husband. Because her husband was not home, S.S. took down information from Carlton about the jobs. As he was leaving, Carlton turned to face S.S. and lifted his shirt to expose a knife with a 6–inch blade tucked into his belt. After pulling the knife, Carlton lunged at S.S. and pushed her to the floor. Carlton held the knife to S.S.'s throat while he ordered her to take off her clothes and move into the bedroom. As S.S. made her way to the bedroom, she tried to escape through a sliding door. Carlton stopped her, ordering her first to "give [him] a blow job," and then, after exposing his penis, to "jack [him] off." S.S. avoided performing oral sex and masturbated Carlton for a few minutes. Then Carlton ordered her to lie on the floor, remove her pants, and touch her vagina. Carlton continued to masturbate and ejaculated on the floor. S.S. gave Carlton money when he demanded it and bound her own ankles with duct tape in response to Carlton's orders. Carlton then bound her wrists and gagged her with duct tape. Before fleeing, Carlton told S.S. that if she tried to escape, he would "come back and get her."

Neither *Spreigl* incident was the subject of a conviction at the time of Carlton's trial, but both incidents had been reported to the police and were the subject of police reports. Additionally, K.A. and S.S. identified Carlton to the police as the perpetrator of the assaults after each incident. And K.A. and S.S. identified Carlton as the perpetrator of the *Spreigl* incidents at Carlton's trial.

The district court found that the S.S. *Spreigl* incident was admissible to show identity and a common plan or scheme. The court noted that both incidents involved use of a knife as a weapon. S.S., like Dover, "was acquainted but only slightly acquainted with [Carlton]," and both incidents occurred in the victim's home. The court also noted that both involved peaceful entry into the victim's home "accommodated by the slight acquaintanceship between the defendant and the victim and a ruse (inquiring about employment with the victim's husband ... compared to possibly seeking aspirin from the victim here)." In both incidents, the perpetrator ejaculated outside the victim, "wanted all of the victim's intimate parts exposed," and bound the victim.

Though the court did not admit the K.A. *Spreigl* incident for evidence of identity, the court did conclude that the K.A. incident was probative of a pattern. The court explained that, even though the K.A. incident shared less obvious similarities with the Dover murder than did the S.S. incident, the two *Spreigl* incidents were "so close in time to the crime here" to render each "probative of pattern. Each *Spreigl* makes the other a part of a pattern." All three incidents involved assaults upon young women with whom Carlton was only slightly acquainted. Carlton allegedly used a ruse (an offer of drugs to K.A. in comparison to possibly seeking an aspirin from Dover) to get K.A. alone in the hotel room. Like the alleged assault of S.S. and the killing of Dover, Carlton allegedly used significant force while assaulting K.A. and ripped off all of her clothes. The court also noted that the "threat to kill has some particularized probativeness in this case." Based on these conclusions, the district court allowed both

K.A. and S.S. to testify at Carlton's trial as to their sexual assaults.

*Carlton's conviction and postconviction proceedings*

A jury found Carlton guilty of both counts of first-degree murder, and the district court sentenced Carlton to life in prison without the possibility of release. Carlton filed a notice of appeal with our court on October 27, 1995. Several months later, Carlton filed a motion waiving representation by the Minnesota State Public Defender and a motion for remand to the district court for postconviction proceedings. On May 13, 1996, we stayed Carlton's appeal pending postconviction proceedings. Carlton did not file a petition for postconviction relief, and on June 12, 1997, we dismissed Carlton's appeal. On August 10, 2010, Carlton, with the assistance of counsel, filed a petition for postconviction relief claiming that the district court erred in (1) failing to suppress evidence seized pursuant to a warrant, and (2) admitting *Spreigl* evidence.

The postconviction court denied Carlton's petition for postconviction relief as untimely under Minn.Stat. § 590.01, subd. 4(a) (2010). The postconviction court explained that Carlton failed to satisfy the interests-of-justice exception in Minn.Stat. § 590.01, subd. 4(b)(5) (2010). After concluding that Carlton's petition was time barred, the postconviction court went on to determine that Carlton's claim that probable cause did not support the search warrant was without merit because the district court made substantial findings justifying the issuance of the warrant. Additionally, the postconviction court concluded that the district court "carefully considered the admission of *Spreigl* evidence and in a thirteen-page memorandum, found that the *Spreigl* evidence was relevant and that its probative value was not outweighed by its potential for unfair prejudice."

Carlton makes two arguments on appeal. Carlton first argues that the postconviction court abused its discretion when it found that his petition was time barred. Carlton also argues that dismissal of his postconviction petition will deny him his due process right to one review of his criminal conviction under the Minnesota Constitution. We may affirm the denial of a postconviction petition without a hearing only when "the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn.Stat. § 590.04, subd. 1 (2010). In reviewing a postconviction court's denial of relief, we review issues of law de novo. *Riley v. State*, 792 N.W.2d 831, 833 (Minn.2011). And "'[w]e afford great deference to a [postconviction] court's findings of fact and will not reverse the findings unless they are clearly erroneous.'" *Id.* (quoting *Dukes v. State*, 621 N.W.2d 246, 251 (Minn.2001)).

I.

We turn first to the question of whether Carlton's petition was timely. Postconviction petitions are governed by Minn.Stat. ch. 590 (2010). Minnesota Statutes § 590.01 imposes a time limit for the filing of postconviction petitions, providing that "[n]o petition for postconviction relief may be filed more than two years after the later of: (1) the entry of judgment of a conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of petitioner's direct appeal." Minn.Stat. § 590.01, subd. 4(a). The Minnesota Legislature added the statute of limitations to the postconviction statute in a 2005 amendment. The legislation amending the statute was effective as of August 1, 2005, and provides that "[a]ny person whose conviction became final before August 1, 2005, shall have two years after the effective date of [the amendment] to file a petition for postconviction relief." *See* Act of June

2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1098; *Miles v. State,* 800 N.W.2d 778, 781 (Minn.2011). The 2–year time limit in subdivision 4(a) is subject to five exceptions. Minn.Stat. § 590.01, subd. 4(b). But a second time limitation in subdivision 4(c) provides that petitions invoking any of the exceptions in subdivision 4(b) must be filed within 2 years of the date the claim giving rise to the invoked exception accrued. Minn.Stat. § 590.01, subd. 4(c).

Carlton's conviction became final well before August 1, 2005. *See Moua v. State,* 778 N.W.2d 286, 288 (Minn.2010) (discussing finality of convictions). To be timely under the general time limit in subdivision 4(a), Carlton therefore had to file his postconviction petition by July 31, 2007. *See id.* Because Carlton did not file his petition until August 2010, his claims are time barred under subdivision 4(a) unless he satisfies an exception under subdivision 4(b). Carlton contends that his petition meets the requirements of the interests-of-justice exception, which provides that a court may hear a petition for postconviction relief filed outside the 2–year time limit in subdivision 4(a) if "the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." Minn.Stat. § 590.01, subd. 4(b)(5). Carlton argues that his petition satisfies that exception because he was "convicted of the most serious charge in the criminal code," is currently "serving the most severe punishment Minnesota law allows," and "has never had a substantive review of his conviction by this Court."

### A.

Before examining whether Carlton's petition satisfies an exception in subdivision 4(b), we should first determine whether he filed his petition in compliance with subdivision 4(c). *See Roby v. State,* 808 N.W.2d 20, 25 (Minn.2011). In other words, we should examine whether Carlton filed his petition within 2 years of the date his claimed interest-of-justice exception under subdivision 4(b)(5) arose. This threshold analysis is potentially unnecessary in this case, however, because the State does not assert that subdivision 4(c) bars Carlton's petition.

■ The State in its brief asserts only that Carlton's petition is barred under the 2–year time limit found in Minn.Stat. § 590.01, subd. 4(a), and fails to establish any of the exceptions in Minn.Stat. § 590.01, subd. 4(b). The State never raised the argument, in either its brief before our court or its original response to Carlton's postconviction petition, that Carlton's petition is barred, in any case, under the 2–year statute of limitations found in Minn.Stat. § 590.01, subd. 4(c). Moreover, the postconviction court, in disposing of Carlton's petition, did not consider whether the time limit in subdivision 4(c) operated to bar Carlton's petition. We must determine, therefore, whether the State's failure to raise the argument constitutes a waiver of the statute of limitations found in subdivision 4(c).

■ Generally, statutes of limitations, like any affirmative defense, may be "waived by a defendant who fails to assert it." *Albers v. Fitschen,* 274 Minn. 375, 377, 143 N.W.2d 841, 843 (1966); *see also Rehberger v. Project Plumbing Co.,* 295 Minn. 577, 578, 205 N.W.2d 126, 127 (1973) (per curiam). It is well established in our precedent "that a defendant, by answering to the merits and going to trial without in any manner attempting to avail himself of a statute of limitations, waives such defense, although it appears on the face of the complaint that the statute has run." *Albers,* 274 Minn. at 377, 143 N.W.2d at 843; *see also Hardwick v. Ickler,* 71 Minn. 25, 27, 73 N.W. 519, 520 (1897) (concluding that "the clearer it appears from the com-

plaint that the statute has run, the clearer it appears from [defendant's] answer that he intended to waive the statute by failing to plead it"). If a defendant "fail[s] to specifically raise the limitation defense in its answer," and the lower court does not decide the issue we "will not consider the applicability of the statute of limitations on appeal." *Rehberger*, 295 Minn. at 578, 205 N.W.2d at 127.

■■■ But in statutorily-created causes of action that establish jurisdictional prerequisites, limitations periods are not affirmative defenses "subject to waiver by any action of the defendants." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 389, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). In such circumstances, a plaintiff's failure to comply with the limitations period results in dismissal of the claim, even in the face of a defendant's silence on the issue. *See Ortiz v. Gavenda*, 590 N.W.2d 119, 122 (Minn. 1999). Dismissal is required because the court in such a case has no jurisdiction to hear the untimely claim, as compliance with the time period is a condition of the statutory right. *See Contos v. Herbst*, 278 N.W.2d 732, 745 (Minn.1979). Jurisdictional limitations periods therefore, "do not have flexible parameters permitting them to be ignored" by courts, *Ortiz*, 590 N.W.2d at 122, and are not subject to "waiver, estoppel, and equitable tolling," *Zipes*, 455 U.S. at 393, 102 S.Ct. 1127.

■■■ For several reasons, we conclude that the statute of limitations in Minn.Stat. § 590.01, subd. 4(c), is not jurisdictional and therefore is subject to waiver by the State. We have found that statutes of limitations operate as jurisdictional bars where the claim subject to the limitations period is purely statutory. *See Ortiz*, 590 N.W.2d at 121 (determining that the statute of limitations was jurisdictional because "[a] wrongful death claim is purely statutory, as common law recognized no such actions on the theory that a claim for

personal injuries died with the victim"); *see also Heidbreder v. Carton*, 645 N.W.2d 355, 363, 370 (Minn.2002) (finding that because Minnesota did not historically recognize a putative father's parental rights, a provision in Minnesota's adoption statutes that established a registration deadline of 30 days after birth for putative fathers was not a statute of limitations subject to equitable tolling, but rather terminated a putative father's substantive rights to a child who is the subject of an adoption petition if the father failed to timely register); *Carlson v. Indep. Sch. Dist. No. 623*, 392 N.W.2d 216, 220–22 (Minn.1986) (concluding that the requirement in the Minnesota Human Rights Act that a plaintiff file a charge with the Department of Human Rights within 6 months of the unfair discriminatory practice was a jurisdictional prerequisite to bringing a cause of action under the statute in district court). In other words, "where a statute gives a new right of action, not existing at common law," a statutory time limit constitutes "an element in the right itself," such that failure to comply with the time limit will deprive the court of jurisdiction to hear the claim. *State v. Bies*, 258 Minn. 139, 147, 103 N.W.2d 228, 235 (1960) (citation omitted).

Unlike purely statutorily-created causes of action, Minn.Stat. ch. 590 did not create an entirely new cause of action unknown at common law. Before the Legislature passed the postconviction statute in 1967, we allowed prisoners to bring writs of habeas corpus or coram nobis to challenge their convictions. *See Kelsey v. State*, 283 N.W.2d 892, 894 (Minn.1979) (explaining that our court "expanded habeas corpus into a kind of all-purpose postconviction remedy in the early 1960's, prior to the enactment of the postconviction remedy act in 1967"); *see also, e.g., State ex rel. Holm v. Tahash*, 272 Minn. 466, 469, 139 N.W.2d 161, 163 (1965); *State v. Osgood*,

266 Minn. 315, 322, 123 N.W.2d 593, 598 (1963); *State ex rel. DuFault v. Utecht*, 220 Minn. 431, 447–48, 19 N.W.2d 706, 713–14 (1945) (referencing the use of the habeas corpus writ at common law); *cf. Boumediene v. Bush*, 553 U.S. 723, 739–45, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (describing the common-law origins of the writ of habeas corpus that trace back to the Magna Carta). The postconviction statute was passed, in part, to replace these common law writs. *See State v. Knaffla*, 309 Minn. 246, 251–52, 243 N.W.2d 737, 740–41 (1976). Indeed, Minn. Stat. § 590.01, subd. 2, states that the remedy provided by the postconviction act "takes the place of any other common law, statutory or other remedies which may have been available for challenging the validity of a conviction ... and must be used exclusively in place of them unless it is inadequate or ineffective to test the legality of the conviction." This exclusivity provision is a strong indication that the postconviction statute merely codified or replaced preexisting remedies rather than creating a brand new statutory cause of action. *See Kelsey*, 283 N.W.2d at 894 (explaining that subdivision 2 "in effect provided that the newly-enacted postconviction remedy was to take the place of the expanded habeas corpus remedy whenever the two conflicted").

In addition, even if we were to determine that the postconviction statute created a new cause of action, that does not end our inquiry. We must also look to the statute's language, history, and structure to evaluate whether the Legislature intended the time limit within the postconviction statute to be a waivable statute of limitations, or a jurisdictional bar. *See Carlson*, 392 N.W.2d at 220–22 (looking to the language, purpose, legislative history, and statutory structure of the Minnesota Human Rights Act to determine that the 6–month filing requirement was a jurisdictional bar); *B.W. & Leo Harris Co. v. City of Hastings*, 240 Minn. 44, 47–49, 59 N.W.2d 813, 815–16 (1953) (examining the language and structure of a statute to determine that a time limit on providing notice before commencing an action affecting title to real estate was not a procedural device but operated to absolutely bar the claim); *see also Zipes*, 455 U.S. at 393–94, 102 S.Ct. 1127 (looking to Title VII's language and legislative history to determine that a time limitation in which to file a charge with the Equal Employment Opportunity Commission was a statute of limitations, not a jurisdictional bar).

Turning to the language of Minn.Stat. § 590.01, subd. 4(c), there is no indication that the Legislature intended the 2–year time limit to operate as a jurisdictional bar.[2] *See In re Civil Commitment of*

---

**2.** Recently the United States Supreme Court has cautioned that, typically, "time prescriptions, however emphatic, 'are not properly typed jurisdictional.'" *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (quoting *Scarborough v. Principi*, 541 U.S. 401, 414, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004)) (internal quotation marks omitted). The label "jurisdictional" should only be used when "delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority." *Scarborough*, 541 U.S. at 413–14, 124 S.Ct. 1856 (citation omitted). The Court in *Arbaugh*

explained that jurisdiction was a separate question from whether a plaintiff could maintain a statutory cause of action, and that "unrefined dispositions" or "drive-by jurisdictional rulings" often improperly stated the reason for dismissal as "lack of jurisdiction" when in fact the plaintiff had merely failed to state a claim upon which relief could be granted. 546 U.S. at 511, 126 S.Ct. 1235. Therefore when Congress does not "clearly state[ ] that a threshold limitation on a statute's scope shall count as jurisdictional ... courts should treat the restriction as nonjurisdictional in character." *Id.* at 515–16, 126 S.Ct. 1235.

*Giem*, 742 N.W.2d 422, 430 (Minn.2007) (examining the language of the statute to determine whether the Legislature intended the time limit in the statute to operate to divest the district court of subject matter jurisdiction and concluding that where "[t]he legislature did not even mention jurisdiction," the timing provision would not be construed to divest the court of jurisdiction). Subdivision 4 in the postconviction statute is titled "Time limit," and it does not reference the jurisdiction of the postconviction court in any way. Minn.Stat. § 590.01, subd. 4. Subdivision 4(c) itself contains no language removing the district court's ability to hear a petition brought under one of the exceptions but outside of the 2–year limitation period. *See* Minn. Stat. § 590.01, subd. 4(c). This paragraph simply provides that "[a]ny petition invoking an exception ... must be filed within two years of the date the claim arises." *Id.*

In the analogous setting of federal habeas corpus petitions,[3] courts have uniformly found that the 1–year limitations period for bringing federal habeas petitions, found in 28 U.S.C. § 2244(d)(1) (2006), is a statute of limitations subject to equitable tolling and does not operate as a jurisdictional bar. *See Day v. McDonough*, 547 U.S. 198, 205, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006); *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir.2000) (collecting cases). In *Calderon v. United States District Court for the Central District of California*, the Ninth Circuit explained that the 1–year time limit in the habeas statute, providing that "[a] 1–year period of limitation shall apply," was not jurisdictional because "[i]t is phrased only as a 'period of limitation,' and 'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.'" 128 F.3d 1283, 1288 (9th Cir.1997) (quoting *Zipes*, 455 U.S. at 394, 102 S.Ct. 1127), *rev'd on other grounds en banc*, 163 F.3d 530 (9th Cir. 1998).[4] The "Time limit" language in Minnesota's postconviction statute is similar to the "period of limitations" language used in the federal habeas context and does not place any limitation on a district court's jurisdiction. Even though the language of Minn.Stat. § 590.01, subd. 4(c), provides that a petition invoking an exception "must be filed within two years," the Supreme Court has found that similarly strong language did not constitute a jurisdictional bar. *See Burnett v. N.Y. Cent. R.R. Co.*, 380 U.S. 424, 426, 85 S.Ct. 1050,

---

3. When debating passage of the 2005 amendments adding the time limitations to the postconviction statute, the Minnesota Legislature specifically noted that the 2–year time limits in Minn.Stat. § 590.01, subd. 4, were influenced by the 1–year statute of limitations on bringing federal habeas corpus claims, "which are very similar in nature to our postconviction remedy act." Hearing on H.F. 2630, H. Judiciary Policy & Fin. Comm., 83d Minn. Leg., Mar. 10, 2004 (audio tape) (statement of witness Hill). At the time of the 2005 amendments, federal courts had already determined that the time limit on bringing habeas corpus petitions was a statute of limitations, not a jurisdictional bar. *See Davis v. Johnson*, 158 F.3d 806, 810–11 (5th Cir.1998).

4. Other states have also been persuaded by the reasoning in federal habeas cases in determining the legal character of time limitations in their own postconviction statutes. For example, in *Davis v. State*, the Montana Supreme Court reversed its own earlier determination that the 1–year time limitation in Montana's postconviction statute constituted a jurisdictional bar. 344 Mont. 300, 187 P.3d 654, 659 (2008). The *Davis* court reached the conclusion that the postconviction time limitation was a waivable statute of limitations in part because a holding that the time limit was a jurisdictional bar "contradict[ed] analogous federal law." *Id.* at 656–57 (finding persuasive the Ninth Circuit's conclusion that "the analogous one-year time bar on federal habeas petitions is not a limit on the federal courts' subject matter jurisdiction" (citing *Calderon*, 128 F.3d at 1289)).

13 L.Ed.2d 941 (1965) (applying equitable tolling to a limitations period mandating that "no action shall be maintained ... unless commenced within three years from the day the cause of action accrued" (citation omitted)).

In addition to the statutory language, the legislative history of our postconviction statute provides further support for the conclusion that the 2–year time limit in subdivision 4(c) was intended to act as a statute of limitations, not a jurisdictional bar. Most notably, the Legislature did not place time limits on postconviction relief until over 30 years after the original statute was passed. Before 2005, chapter 590 placed no limitation on the time in which a convicted person could bring a petition for postconviction relief. This later enactment indicates that the Legislature did not intend for the 2–year time limit in subdivision 4(c) to act as a bar on the district court's ability to hear a petition. For more than 30 years, district courts had the authority to hear postconviction petitions brought at any time. If the Legislature had intended the time limit to alter drastically the district court's jurisdiction, rather than merely serving as an affirmative defense, we would expect the deprivation of jurisdiction to be explicitly stated. *See Giem,* 742 N.W.2d at 430.

Instead, the Legislature chose time limit language that "reads like an everyday, run-of-the-mill statute of limitations." *Calderon,* 128 F.3d at 1288 n. 4. During committee hearings about the proposed time-limit amendment to our postconviction statute, legislators and county attorneys alike referred to the time limit on numerous occasions as a statute of limitations, and never mentioned the limit's effect on a district court's jurisdiction. Hearing on H.F. 2630, H. Judiciary Policy & Fin. Comm., 83d Minn. Leg., Mar. 10, 2004 (audio tape). The bill's sponsor stated that subdivision 4 "in plain English ...

establishes a two-year statute of limitation for postconviction appeals." Hearing on H.F. 2630, H. Judiciary Policy & Fin. Comm., 83d Minn. Leg., Mar. 10, 2004 (audio tape) (comments of Rep. Smith, House sponsor of the bill). The *Calderon* court found similar language in the legislative history underlying passage of the time limitation on federal habeas petitions to be persuasive evidence that the time limit was not intended to be a jurisdictional bar. 128 F.3d at 1288. The court described the legislative history as demonstrating with "resounding clarity" that the 1–year time limit was not intended to restrict a federal court's jurisdiction, because no "statements of individual House or Senate members ... describe the one-year limitation as a restriction on federal court jurisdiction." *Id.* Moreover "[m]any members of Congress—including [the statute]'s authors ... did, however, describe [the time limitation] as a 'statute of limitations.'" *Id.* (citations omitted).

The structure of the postconviction statute also supports our conclusion that the time period in Minn.Stat. § 590.01, subd. 4(c), is a statute of limitations subject to waiver. Several provisions in the postconviction statute specifically direct courts to ignore the technical requirements of the statute when it would frustrate the goal of providing convicted individuals with postconviction relief. For example, Minn.Stat. § 590.03 provides that "[t]he court shall liberally construe the petition and any amendments thereto and shall look to the substance thereof and waive any irregularities or defects in form." *See also Miles v. State,* 800 N.W.2d 778, 782, 784 (Minn. 2011) (liberally construing a petition to analyze whether petitioner met the newly discovered evidence exception even though he had not "explicitly invoke[d] the newly discovered evidence exception" and allowing the petitioner an opportunity to file a new petition to allege evidence with a "suf-

ficient indicia of reliability" to meet the newly discovered evidence exception); *Roby v. State,* 787 N.W.2d 186, 191 (Minn. 2010); *Hathaway v. State,* 741 N.W.2d 875, 877 (Minn.2007). Additionally, Minn. Stat. § 590.04, subd. 3, provides that "[t]he court may inquire into and decide any grounds for relief, even though not raised by the petitioner." These provisions indicate that strict compliance with the technical requirements in the postconviction statute is not necessary for the court to exercise jurisdiction. The provisions calling for judicial discretion in the postconviction statute are distinguishable from our wrongful death statute, which this court has repeatedly recognized demands a "high standard of strict compliance." *Ortiz,* 590 N.W.2d at 122; *see also Bonhiver v. Fugelso, Porter, Simich & Whiteman, Inc.,* 355 N.W.2d 138, 141 (Minn. 1984) ("Because the right to maintain an action for wrongful death is created by statute and is in derogation of the common law, the requirements of the statute have generally been strictly construed."). Because the structure of the postconviction statute calls for construction of postconviction petitions to effectuate the purpose of providing relief to petitioners, and allows the court in its discretion to consider any grounds for relief, it would be inconsistent with the statute as a whole to enforce the time limitation as a jurisdictional bar where the State has failed to assert the untimeliness of the petition.

Furthermore, many of the factors relied upon by federal courts in applying equitable tolling to the 1–year limitations period on bringing federal habeas corpus petitions counsel in favor of finding the limitations period in Minn.Stat. § 590.01, subd. 4(c), to be a statute of limitations, not a jurisdictional bar.[5] In *Holland v. Florida,* the United States Supreme Court applied the doctrine of equitable tolling to the 1–year limitations period in the federal habeas corpus statute. —— U.S. ——, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010). The Court found that equitable tolling was appropriate because, unlike tolling the time limitation for seeking income tax refunds, extending the time limit to file a habeas petition would not "affect the 'substance' of a petitioner's claim." *Id.* at 2561 (citing *United States v. Brockamp,* 519 U.S. 347, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997)). Additionally, the Court noted that, in contrast with an "unusually generous" 12–year statute of limitations for land claims, to which equitable tolling was not applicable, the 1–year limitations period applied to habeas corpus petitions was "not particularly long." *Id.* (citing *United States v. Beggerly,* 524 U.S. 38, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998)). Finally, the Court concluded that "unlike the subject matters at issue in both *Brockamp* and *Beggerly*— tax collection and land claims—[habeas corpus] pertains to an area of the law where equity finds a comfortable home." *Id.*

The factors supporting application of equitable tolling to the federal habeas corpus statute of limitations in *Holland* likewise indicate that the 2–year time limit in Minn. Stat. § 590.01, subd. 4(c), is not jurisdictional. Like the time limitation applied to federal habeas petitions, the postconviction

---

5. The key question underlying whether equitable tolling applies to a particular limitations period is whether equitable tolling would be "inconsistent with the text of the relevant statute." *United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998). Because "the extent to which a statutory deadline is phrased in jurisdictional terms is relevant" to determining whether a time limit is subject to equitable tolling, factors that support equitably tolling a statutory time limit necessarily support the proposition that such a limitations period is not jurisdictional. *Neverson v. Farquharson,* 366 F.3d 32, 40 n. 8 (1st Cir.2004).

time limit of 2 years is not unusually generous. And most importantly, the postconviction statute addresses "an area of the law where equity finds a comfortable home." *Holland,* 130 S.Ct. at 2561. The commitment to an equitable result in postconviction proceedings is apparent in our jurisprudence predating enactment of the 2–year time limit. *See, e.g., Butala v. State,* 664 N.W.2d 333, 338 (Minn.2003) (explaining that the "commitment to convicted defendants' rights to at least one substantive review" allowed this court to review the merits of defendant's petition despite a 22–month delay in obtaining appellate review); *Rairdon v. State,* 557 N.W.2d 318, 322 (Minn.1996) (finding defendant's delay in filing a postconviction petition was outweighed by "our commitment to convicted defendants' rights to substantive review" under the postconviction statute); *Hoagland v. State,* 518 N.W.2d 531, 536 (Minn.1994) (determining that an 8–year delay did not prevent this court from reviewing the petitioner's substantive claims); *Riggers v. State,* 284 Minn. 543, 543–44, 169 N.W.2d 58, 59 (1969) (per curiam) (finding that a 33–year delay in bringing a postconviction petition did not preclude relief under chapter 590). Moreover, we have consistently emphasized the underlying importance of a defendant's statutory right to one review of a

conviction. Reviewing a defendant's conviction is "[i]n keeping with our responsibility to vindicate a denial of fundamental rights and thereby prevent manifest injustice." *Butala,* 664 N.W.2d at 338; *see also Stutelberg v. State,* 741 N.W.2d 867, 874 (Minn.2007) (citing the absence of any appellate review of defendant's claims to be a critical factor in granting review of the merits of the defendant's postconviction petition,); *Spann v. State,* 704 N.W.2d 486, 493 (Minn.2005) ("Once the defendant is convicted, institutional concerns that the conviction was fair and proper become paramount."). Our longstanding jurisprudence suggests that equity is an important component of postconviction relief, indicating that the time limit in subdivision 4(c) is a statute of limitations subject to equitable principles.

■ For all of these reasons, we conclude that the time limitation in subdivision 4(c) does not operate as a jurisdictional bar, and that it therefore is subject to waiver.[6] Because we find that the limitations period in subdivision 4(c) is not jurisdictional, the State's failure to assert that Carlton's petition was untimely under the 2–year statute of limitations in subdivision 4(c) waived this defense. Therefore, we go on to consider whether the interests-of-justice exception found in Minn.Stat.

---

**6.** We acknowledge that earlier cases from our court could be read to suggest that the time limitations in the postconviction statute may be jurisdictional requirements. Most notably, in *Stewart v. State* we declined to consider the petitioner's postconviction claims on the merits because he had filed his petition outside the 2–year limitations period provided in Minn.Stat. § 590.01, subd. 4(a), and failed to assert that he satisfied one of the exceptions in subdivision 4(b). 764 N.W.2d 32, 34 (Minn.2009). In affirming dismissal of Stewart's postconviction petition for failure to timely file his petition, we cited *Ortiz* for the proposition that Stewart's claims "should not be considered on the merits," because " 'limitation provisions in a statutorily created cause

of action are jurisdictional, requiring dismissal for failure to comply.' " *Stewart,* 764 N.W.2d at 34 (quoting *Ortiz,* 590 N.W.2d at 122); *see also Reed v. State,* 793 N.W.2d 725, 732 (Minn.2010) (citing *Stewart* and *Ortiz* as examples of decisions in which we have "recognized the distinction between filing requirements that prescribe a district court's jurisdiction and a 'statute of limitations, [which] is subject to waiver' " (alteration in original)) (quoting *Carlson v. Indep. Sch. Dist. No. 623,* 392 N.W.2d 216, 220–21 (Minn.1986)). But in neither *Stewart* nor *Reed* did we expressly address and analyze, as we do in this opinion, the legal character of the limitations provision.

§ 590.01, subd. 4(b)(5), permits Carlton's petition to be heard.

### B.

■ The interests-of-justice exception to the 2–year statute of limitations provides that a court may hear a petition for postconviction relief if "the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." Minn.Stat. § 590.01, subd. 4(b)(5). Carlton contends that the postconviction court erred when it concluded that he failed to establish this exception to the general 2–year time limit in subdivision 4(a).

### 1.

We turn first to the question of whether Carlton's petition is frivolous. Carlton raises concerns about evidence that he contends was seized without a proper warrant. He also argues that the district court erroneously admitted *Spreigl* evidence. The postconviction court found that Carlton had failed to prove that his petition was not frivolous.

■ The threshold required of petitioners to meet the nonfrivolous standard is not a high one. A petition is considered frivolous "if it is perfectly apparent, without argument, that the petition is without merit." *Gassler v. State*, 787 N.W.2d 575, 586 (Minn.2010) (citing *Black's Law Dictionary* 692 (8th ed.1999) (defining "frivolous" as "[l]acking a legal basis or legal merit; not serious; not reasonably purposeful")). The petitioner need show only "that there is a good-faith basis for the claim made in the petition, not that he necessarily would succeed on the merits." *Rickert v. State*, 795 N.W.2d 236, 241 (Minn.2011). Carlton alleges with great factual and legal specificity that the warrant to search his person was not supported by probable cause, and that the district court erred in admitting the

*Spreigl* evidence. And he supports his arguments with good faith interpretations of our precedent. *See id.* at 242 We therefore conclude that the postconviction court erred when it concluded that Carlton's petition was frivolous.

### 2.

■ We turn next to the question of whether Carlton's petition should be considered in the interests of justice. We have long held that the interests of justice are implicated only in exceptional and "extraordinary situations." *Gassler*, 787 N.W.2d at 586; *State v. Green*, 747 N.W.2d 912, 919 (Minn.2008); *see also Valencia v. Markham Coop. Ass'n*, 210 Minn. 221, 226, 297 N.W. 736, 738–39 (1941).

In *Gassler*, we identified a nonexclusive list of factors that had informed the interests-of-justice inquiry in other contexts. 787 N.W.2d at 586–87. Specifically, we noted that in prior cases addressing the interests of justice outside the context of the interest-of-justice exception in subdivision 4(b)(5), we have examined: (1) whether the claim has substantive merit; (2) whether the defendant deliberately and inexcusably failed to raise the issue on direct appeal; (3) whether the party alleging error is at fault for that error and the degree of fault assigned to the party defending the alleged error; (4) whether some fundamental unfairness to the defendant needs to be addressed; and (5) whether application of the interests-of-justice analysis is necessary to protect the fairness, integrity, or public reputation of judicial proceedings. *Gassler*, 787 N.W.2d at 586–87.

We considered these factors in *Gassler* and assessed the showing by a petitioner required to meet the interests-of-justice exception in the postconviction context. We ultimately concluded that the interests-of-justice exception was not satisfied.

*Id.* at 587. In determining whether Gassler had received "a trial so fundamentally unfair to Gassler as to require us to act to protect the integrity of the judicial process," we discussed the fact that there was no dispute that Gassler's claim had substantive merit, that Gassler had never had an opportunity to have his claim heard, and that the delay in filing for postconviction relief was wholly attributable to the FBI.[7] *Id.* Despite these conclusions, we determined that "it would be a miscarriage of justice to consider Gassler's petition" because there was "substantial ... evidence of Gassler's guilt admitted at trial, including evidence that Gassler admitted to others that he had killed [the victim]." *Id.* (citation omitted) (internal quotation marks omitted). Accordingly, we held that the interests-of-justice exception in the postconviction statute had not been met. *Id.*

In *Rickert v. State*, on the other hand, we found that the interests-of-justice exception had been satisfied. 795 N.W.2d at 242. Rickert pleaded guilty to first-degree criminal sexual conduct on August 16, 2006, and did not file a direct appeal. *Id.* at 238. In April 2008 the State Public Defender's Office requested a transcript of the plea hearing on Rickert's behalf. *Id.* The transcript was not received until August 14, 2008, 4 days before the statute of limitations period expired under the postconviction statute. *Id.* On August 20, 2008, Rickert filed a motion for a 2–month extension, arguing that the court should grant the extension in the interests of justice. *Id.* at 238–39. We determined that the interests-of-justice exception ap-plied to Rickert's claim, focusing on Rickert's lack of fault in causing the delay. *Id.* at 242. Because "Rickert requested the services of the [State Public Defender's Office] well within the original statute of limitations," and "Rickert's postconviction counsel did not receive the transcript ... until August 14, 2008, which was only two business days before the statute of limitations expired," it was in the interests of justice to allow Rickert's claims to proceed. *Id.*

As our analysis in *Rickert* indicates, the factors identified in *Gassler* do not form a rigid test. Although the factors may inform a court's inquiry regarding whether allowing the untimely filing of a defendant's postconviction petition is necessary to protect the fairness, integrity, or public reputation of judicial proceedings, courts are not required to examine each *Gassler* factor in every case asserting the interests-of-justice exception to Minn.Stat. § 590.01, subd. 4(a). Different factors may be dispositive in the unique circumstances of each case. *See Rickert*, 795 N.W.2d at 242 (expressly discussing only one of the *Gassler* factors, specifically the degree to which the fault of the petitioning party caused the untimely filing of the petition). Here, the postconviction court, as well as the parties, addressed all the *Gassler* factors in determining whether allowing the untimely filing of Carlton's postconviction petition is necessary to protect the integrity of judicial proceedings. Consequently, a discussion of each factor is appropriate under the facts of this case.

With respect to the first factor, Carlton argues that his claims are meritorious and

---

7. Although we noted that the substantive merit of Gassler's claim was undisputed, our decision in *Gassler* does not require a postconviction court to thoroughly consider the substantive merits of a defendant's claims when analyzing the defendant's assertion of the interests-of-justice exception in Minn.Stat. § 590.01, subd. 4(b)(5). In fact, we expressly stated in *Gassler* that whether a defendant can establish an exception under Minn.Stat. § 590.01, subd. 4(b), "is a separate question from whether the substantive claims made in the petition itself entitle [the petitioner] to relief on those claims." *Gassler*, 787 N.W.2d at 582.

that we should review them because he was convicted of first-degree murder and he has not had appellate review of his conviction. In essence, Carlton argues that it is always in the interests of justice to review a petition from a person convicted of first-degree murder who has not had appellate review. But we cannot rewrite subdivision 4(b) in the postconviction statute to provide an additional exception to the 2–year time limit in subdivision 4(a) for those convicted of first-degree murder whose convictions were not reviewed on direct appeal. *See Laase v. 2007 Chevrolet Tahoe,* 776 N.W.2d 431, 438–40 (Minn. 2009) (noting that "[w]e cannot rewrite a statute under the guise of statutory interpretation" because "it is the role of the legislature, not the courts, to rewrite [a] statute to provide greater protection"); *see also Phelps v. Commonwealth Land Title Ins. Co.,* 537 N.W.2d 271, 274 (Minn.1995) (declining to read into a statute "restrictions or guidelines that the legislature has not included"). And even if we were to conclude that there is substantive merit to Carlton's claims, that does not necessarily lead to the conclusion that it serves the interests of justice to set aside the time limit in subdivision 4(a). *See Gassler,* 787 N.W.2d at 587 (determining that there was substantive merit to Gassler's claims, but nevertheless concluding that it was not in the interests of justice to set aside the time limit in subdivision 4(a)).[8] As in *Gassler,* consideration of the other factors confirms that the interests of justice do not require us to set aside the time limit in Minn.Stat. § 590.01, subd. 4(a).

With respect to the second factor, there is nothing in the record that indicates that Carlton's failure to follow through with his appeal or postconviction relief in a timely manner was anything other than deliberate and inexcusable. Carlton's only argument on this point is that, although he failed to file a timely appeal and failed to file a timely postconviction petition, his actions were not as deliberate as in *McMaster v. State* when a defendant did not seek review for 15 years to avoid extradition to Canada where he would be subject to capital punishment. 551 N.W.2d 218, 219 (Minn.1996). But Carlton has not shown that his delay was excusable or that his actions were not deliberate, and therefore the second factor does not weigh in favor of application of the interests-of-justice exception in this case.

The third *Gassler* factor, examining the degree to which the party alleging the error is at fault for that error, also weighs against Carlton, because he bases his interests-of-justice argument on the lack of appellate review in his case. This error is attributable to Carlton, not to the State, because it was Carlton who failed to follow through with either a direct appeal or timely postconviction petition. *See State v. Wembley,* 728 N.W.2d 243, 245–46 (Minn.

---

8. Even though it is not necessary for us to review the merits of Carlton's claims, our review of the record convinces us that the district court did not err either in admitting evidence seized from Carlton's person pursuant to the warrant or in admitting the *Spreigl* evidence. The information provided to support the warrant application is detailed above, and given our deferential standard of review, we agree with the postconviction court that the district court did not err in concluding that the warrant was supported by probable cause. *See State v. Harris,* 589 N.W.2d 782, 787 (Minn.1999) (noting that we "afford 'great deference' to the issuing judge's finding of probable cause" (citation omitted)). The *Spreigl* evidence at issue is also detailed above. The incidents were close in time and similar in circumstance to the Dover murder. *See State v. DeBaere,* 356 N.W.2d 301, 305 (Minn.1984). The district court also took steps to minimize the prejudice resulting from their admission. *See State v. Blom,* 682 N.W.2d 578, 611 (Minn.2004). Based on our review of the record, we cannot say that the district court abused its discretion in admitting either of the *Spreigl* incidents.

2007) (determining that the interests of justice did not require considering defendant's argument regarding a recording, because the defendant for "a tactical reason" had "affirmatively requested that the jury have access to the tape"); *White v. State*, 711 N.W.2d 106, 111 (Minn.2006) (determining that the interests of justice did not require review when the defendant "did not raise to the district court the issue of racial discrimination in the grand jury selection process" at the proper time). Carlton argues that the third factor, weighing the degree to which the petitioner is at fault, "does not appear to apply in this case since Carlton never had a review of his case." This argument misconstrues the factor, which looks to the instances giving rise to the interests-of-justice exception, not to any alleged errors giving rise to the underlying claims in the petition. Carlton was in control of his failure to obtain review, therefore this factor also weighs against him.

With regard to the fourth and fifth factors assessing fundamental unfairness and the integrity of the judicial process, Carlton argues that it is fundamentally unfair for a defendant convicted of first-degree murder not to receive appellate review, and that the integrity of the judicial system depends upon review of convictions involving life imprisonment. First-degree murder is the most serious offense of which a defendant can be convicted in Minnesota, and a conviction for first-degree premeditated murder mandates a sentence of life in prison without the possibility of release. Given these facts, Carlton contends that when a defendant convicted of first-degree murder has not received appellate review of his conviction, the case constitutes the type of extraordinary circumstances that warrant application of the interests-of-justice exception.

But our fairness inquiry under the interests-of-justice analysis has often involved looking to whether the party had an opportunity to correct any potential unfairness. *See Green*, 747 N.W.2d at 919 (finding that where a defendant had an opportunity on cross-examination to correct an inaccurately transcribed statement, and failed to do so, the interests of justice did not require this court to grant a new trial). Here, Carlton had an opportunity to seek review of his underlying claims and failed to do so multiple times. Additionally, nothing in Carlton's petition suggests that the integrity of the judicial system will be harmed if his claim is not reviewed. Carlton does not allege misconduct or flagrant disregard for judicial process. *See State v. Cabrera*, 700 N.W.2d 469, 473–75 (Minn. 2005) (reversing defendant's conviction in the interests of justice because of "serious prosecutorial misconduct" through "improper injection of race into [the] closing argument"). Rather, Carlton's claims involve two discretionary decisions on probable cause and evidentiary issues. Given the extraordinary nature of the interests-of-justice exception, and the fact that Carlton has failed to allege facts to show that application of the exception to his case is necessary to prevent unfairness, these fourth and fifth *Gassler* factors do not require us to hear Carlton's petition.

After examining factors that inform the interests-of-justice determination, we hold that Carlton has not established the exception in Minn.Stat. § 590.01, subd. 4(b)(5), because he has not demonstrated that it would be in the interests of justice for us to set aside the time limit in subdivision 4(a) and allow his untimely petition to proceed. We therefore conclude that the postconviction court properly denied Carlton's petition as untimely under Minn.Stat. § 590.01, subd. 4(a).

II.

Carlton asserts that, even if his petition does not satisfy the time require-

ments of the postconviction statute, the Due Process Clause of the Minnesota Constitution guarantees all defendants an unlimited right to one review of their convictions. Carlton contends that this unlimited right to one review is satisfied "either by direct appeal or a post-conviction proceeding," and that "the time limit in the post-conviction statute [is] unconstitutional to the extent it precludes postconviction review for defendants who have never had their convictions reviewed." Because Carlton has never had his conviction for first-degree murder reviewed through either a direct appeal or a postconviction proceeding,[9] Carlton argues that dismissal of his postconviction petition violates his due process rights.

■■■■ We review the constitutionality of a statute de novo. *See State v. Benniefield,* 678 N.W.2d 42, 45 (Minn.2004). Statutes are presumed to be constitutional, and we will find a statute unconstitutional only "when absolutely necessary." *State v. Behl,* 564 N.W.2d 560, 566 (Minn.1997) (citation omitted); *see also Rio Vista Non–Profit Hous. Corp. v. Cnty. of Ramsey,* 335 N.W.2d 242, 245 (Minn.1983). The party challenging a statute must demonstrate that the statute "is unconstitutional beyond a reasonable doubt." *State v. Bartylla,* 755 N.W.2d 8, 14 (Minn.2008).

■■ The United States Supreme Court has unambiguously determined that the United States Constitution does not guarantee a right to an appeal under the Due Process Clause of the Fourteenth Amendment. In *McKane v. Durston,* the Court held that "[a] review by an appellate court of the final judgment in a criminal case,

however grave the offen[s]e of which the accused is convicted, was not at common law and is not now a necessary element of due process of law." 153 U.S. 684, 687, 14 S.Ct. 913, 38 L.Ed. 867 (1894); *see also Evitts v. Lucey,* 469 U.S. 387, 393, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). The right to an appeal is "not a matter of absolute right," leaving it entirely "within the discretion of the State to allow or not to allow such a review." *McKane,* 153 U.S. at 687, 14 S.Ct. 913; *see also Halbert v. Michigan,* 545 U.S. 605, 610, 125 S.Ct. 2582, 162 L.Ed.2d 552 (2005) ("The Federal Constitution imposes on the States no obligation to provide appellate review of criminal convictions.").

Because "[p]ost–conviction relief is even further removed from the criminal trial than is discretionary direct review," the Supreme Court has held that the United States Constitution provides even less support for finding a right to postconviction relief than it does for finding a right to direct appeal. *Pennsylvania v. Finley,* 481 U.S. 551, 556–57, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). Therefore, the Court has concluded that the Due Process Clause imposes no obligation on states to provide postconviction relief mechanisms. *See id.* at 557, 107 S.Ct. 1990. Carlton accordingly makes no argument that the Due Process Clause of the Fourteenth Amendment entitles him to one review.

Carlton argues instead that he is entitled to review under the Minnesota Constitution. But Carlton does not dispute that he had the opportunity to take a direct appeal of his conviction and to file a postconviction petition under Minn.Stat. § 590.01. This case therefore requires us to decide only the narrow question of

9. The postconviction court did cursorily review the merits of Carlton's petition. But because we find that the Due Process Clause of the Minnesota Constitution does not contemplate an unlimited right to one review, we

do not decide if the postconviction court's review would have been sufficient to satisfy the unlimited right to one review for which Carlton argues.

whether the Minnesota Constitution guarantees a defendant an *unlimited* right to one review. We do not decide whether the Due Process Clause of the Minnesota Constitution would prohibit the Legislature from eliminating postconviction review entirely.[10]

Carlton first argues that our precedent compels the conclusion that he has an unlimited right to one review of his conviction, and that therefore the time limitations in Minn.Stat. § 590.01, subd. 4, are unconstitutional as applied to him. Carlton relies on *State v. Knaffla* as the first announcement from our court that a constitutional right to one review of a criminal conviction exists. *Knaffla* described Minnesota's postconviction statute as a

"legislative response to the United States Supreme Court's pronouncement in *Case v. Nebraska*," which implied "that a convicted defendant is entitled to at least one state corrective process to determine a claim of violation of Federal constitutional rights." 309 Minn. 246, 251, 243 N.W.2d 737, 740 (1976) (citing *Case v. Nebraska*, 381 U.S. 336, 85 S.Ct. 1486, 14 L.Ed.2d 422 (1965) (per curiam)). In this context, the *Knaffla* court went on to explain that the "salient feature of Minn.Stat. c[h]. 590 in coordination with *Case v. Nebraska*, is that a convicted defendant is entitled to at least one right of review by an appellate court or postconviction court." *Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741 (citation omitted).[11] We did not indicate in *Knaffla*

10. The dissent erroneously contends that we hold "that persons convicted of a crime under state law in Minnesota do not have a constitutional right to at least one substantive review of their conviction." We have reached no such conclusion. Contrary to the dissent's assertion, our opinion considers a much narrower question, and reaches a much narrower conclusion. This case does not require our court to decide whether it would be consistent with the due process protections provided by the Minnesota Constitution for the Legislature to eliminate postconviction review of convictions entirely. Rather, this case presents only the question of whether—even if criminal defendants have a right to one review—the time limits in Minn.Stat. § 590.01, subd. 4, are a permissible limitation on that right. Because the dissent premises its argument on an overly broad characterization of the issues presented by this case, it never disputes the fundamental principle that constitutional rights can be, and indeed often are, subject to reasonable limitations. *See, e.g., State v. Rhoades*, 120 Idaho 795, 820 P.2d 665, 676–77 (1991) (holding that a statute requiring a defendant to file a petition for postconviction relief within 42 days of the filing of a judgment imposing the sentence of death did not violate a defendant's due process rights because though "[t]he legislature has seen fit to appropriately limit the time frame within which to bring challenges which are known or which reasonably should be known," the postconviction review provided

by Idaho statute "provide[d] adequate opportunity to present the issues raised and to have them adequately reviewed"); *State v. Richardson*, 670 N.W.2d 267, 277 (Minn.2003) (explaining that a criminal defendant's constitutional "right to present a defense is not without limitations" and therefore defendants "must comply with procedural and evidentiary rules" even where such rules limit a defendant's ability to present his version of the facts). More specifically, the dissent never disputes that even constitutional rights can be properly limited by statutes of limitation. *Wichelman v. Messner*, 250 Minn. 88, 108, 83 N.W.2d 800, 817 (1957) (explaining that statutes of limitation "will bar any right, however high the source from which it may be deduced, provided that a reasonable time is given a party to enforce his right" and that our court "will not inquire into the wisdom of the exercise" of the Legislature's discretion in fixing the time period in which to exercise a particular right "unless the time allowed is manifestly so short as to amount to a practical denial of justice" (citations omitted)).

11. The language implying a constitutional right to postconviction relief in *Knaffla* was premised on an incorrect reading of *Case.* In *Case,* the Supreme Court granted certiorari to determine whether the Fourteenth Amendment required that Nebraska afford a state prisoner adequate corrective process for hearing and determination of his claims of viola-

whether the "one right of review" was based on the Minnesota Constitution or grounded in statutory or common-law provisions. In addition, we substantially limited our discussion regarding the review of criminal convictions by making clear that "in a postconviction proceeding, relief is to be predicated ... *upon compliance with the procedural requirements* of Minn.Stat. c[h]. 590." 309 Minn. at 252, 243 N.W.2d at 741 (emphasis added). Any language in *Knaffla* suggesting a constitutional right to review, therefore, speaks only of a right to review conditioned on complying with the procedural requirements of the postconviction statute.

Carlton also relies on *Spann v. State* for the proposition that the right to have a criminal trial reviewed for error is "an integral part of the criminal justice system." 704 N.W.2d 486, 490 (Minn.2005). But the context of *Spann* and the narrow issue before us in that case confirm that the language was not intended to have the sweeping implication of granting defendants an unlimited constitutional right to one review.

In *Spann,* we determined that an agreement between the State and the defendant requiring the defendant to waive all rights to appellate review in exchange for a reduced sentence, after the defendant had been found guilty by a jury, was invalid as a matter of public policy and violated the defendant's right to due process. *Id.* at 494–95. We began our analysis in *Spann* by recognizing that convicted defendants do "not have a constitutional right to appeal under either the United States Constitution or the Minnesota Constitution," but further explained that "in Minnesota ... 'a convicted defendant is entitled to at least one right of review by an appellate or postconviction court.'" *Id.* at 491 (quoting *Knaffla,* 309 Minn. at 252, 243 N.W.2d at 741) (citing Minn.Stat. § 244.11, subd. 1 (2004); Minn. R.Crim. P. 28.02). We did not specify in *Spann* whether such a right was grounded in statute or the constitution, but cited statutes and rules of criminal procedure as well as *Knaffla,* which as explained above expressly placed the defendant's right to review in Minnesota within the postconviction statute and subject to its accompanying procedural requirements.

Additionally, *Spann* focused on the important public policy reasons that counseled against allowing a defendant to waive his right to appeal after trial. Carlton takes *Spann*'s discussion out of context by suggesting that *Spann* stood for the general proposition that "the right to have a criminal trial proceeding reviewed for error is critical to ensuring the trial was fair." *Spann* spoke more specifically about the incentives that the waiver at issue would create for prosecutors and judges to insulate their errors from review by "bargaining away a defendant's appeal rights." 704 N.W.2d at 492 (citation omitted). Because such a waiver would necessarily be extracted from a defendant with little or no bargaining power, and would implicate broader institutional issues about fairness, we determined that the right to appeal could not be waived at that particu-

---

tion of federal constitutional guarantees. 381 U.S. at 336–37, 85 S.Ct. 1486. After the Court granted certiorari, the Nebraska Legislature enacted a statute providing for a postconviction procedure, which "obviate[d] the necessity" of the Supreme Court deciding the issue. *Case,* 381 U.S. at 337, 85 S.Ct. 1486 (Clark, J., concurring). Because the Supreme Court later made clear that states are not constitutionally required to provide a postconviction process, *Finley,* 481 U.S. at 555–57, 107 S.Ct. 1990, the suggestion in *Knaffla* that a postconviction remedy was necessary to vindicate constitutional rights indicates only that our court thought that the Federal Constitution may require some postconviction process, not that the Minnesota Constitution uniquely guaranteed it.

lar stage of trial. *Id.* at 493. The institutional concerns at issue in *Spann* are not present in Carlton's case. The district court and the prosecutor had nothing to do with Carlton's failure to file a direct appeal or a postconviction petition; the failure to file was entirely due to Carlton.

Carlton finally relies on *Deegan v. State,* in which we held that the State's failure to provide counsel to defendants in postconviction proceedings violated a defendant's right to counsel under the Minnesota Constitution. 711 N.W.2d 89, 98 (Minn.2006). In *Deegan* we stated that "it may well be that the right to one review . . . is a 'tradition unique to Minnesota.' And because traditions unique to Minnesota may reflect a guarantee in the Minnesota Constitution, the right to one review of a criminal conviction may arguably be grounded in the Minnesota Constitution." *Id.* at 95 (quoting *Kahn v. Griffin,* 701 N.W.2d 815, 825 (Minn.2005)). This statement, however, was dicta "because the resolution of· that question [was] not necessary to our ultimate holding in [*Deegan* ]." *Id.* Additionally, we expressly distanced *Deegan's* holding from the statement that the right to one review may be grounded in the Minnesota Constitution by recognizing that "the right to counsel on appeal may be constitutionally guaranteed even where the right to appellate review is not." *Id.* at 97. Moreover, even if we accept Carlton's argument that the right to one review may be grounded in the Minnesota Constitution, nothing in *Deegan* suggests that the right cannot be subject to time requirements. *See Wichelman v. Messner,* 250 Minn. 88, 107, 83 N.W.2d 800, 817 (1957) (explaining that statutes of limitation "will

bar any right, however high the source from which it may be deduced, provided that a reasonable time is given a party to enforce his right" (citation omitted)). In short, our precedent that Carlton relies on does not support his claim that a defendant has an unlimited constitutional right to one review.

In addition to his argument based on our precedent, Carlton also argues more generally that he has an unlimited right to review grounded in the Due Process Clause of the Minnesota Constitution. The Due Process Clause of the Minnesota Constitution guarantees that "[n]o person shall be held to answer for a criminal offense without due process of law . . . nor be deprived of life, liberty, or property without due process of law." Minn. Const. art. I, § 7. Even if this provision guarantees a criminal defendant a right to a substantive review,[12] such a right can still be constitutionally limited by the Legislature. Due process requires only that "every defendant be afforded a meaningful opportunity to present a complete defense." *State v. Richardson,* 670 N.W.2d 267, 277 (Minn.2003) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)) (internal quotation marks omitted). Due process has always been subject to limitations, and "both the accused and the state must comply with procedural and evidentiary rules designed to ensure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* (citation omitted) (internal quotation marks omitted); *see also Spann,* 704 N.W.2d at 491 (explaining that "a defendant can always waive the right to appeal simply by not filing an appeal"); *State*

---

**12.** Our precedent has been clear that the Due Process Clause of Minnesota's Constitution does not provide defendants with a right to appeal. *See Spann,* 704 N.W.2d at 491 (recognizing that convicted defendants do "not have a constitutional right to appeal under either the United States Constitution or

the Minnesota Constitution"); *cf. In re O'Rourke,* 300 Minn. 158, 164, 220 N.W.2d 811, 815 (1974) ("We hold that the Minnesota Constitution does not, either expressly or by necessary implication, guarantee to the individual a right of appeal. . . .").

*v. Taylor*, 650 N.W.2d 190, 205 (Minn.2002) (finding that a defendant can waive his right to appeal a particular issue by failing to object to an error at trial); *Roby v. State*, 547 N.W.2d 354, 357 (Minn.1996) (declining to consider issues on appeal not argued to and considered by the district court).

Our precedent from the time after the enactment of the postconviction statute, but before the addition of the 2–year statute of limitations on postconviction relief, supports the conclusion that defendants do not have an unlimited right to review.[13] On several occasions we denied postconviction petitions, even where the defendant had not taken a direct appeal, because of the defendant's delay in filing the petition. *See, e.g., McMaster v. State*, 551 N.W.2d

218, 219 (Minn.1996) (concluding that a "15–year delay in seeking post-conviction relief" was fatal to the defendant's petition); *Houghton v. State*, 296 Minn. 494, 495, 207 N.W.2d 63, 64 (1973) (per curiam) (concluding that a 46–year delay in bringing a postconviction petition precluded relief); *Gaulke v. State*, 296 Minn. 487, 487, 206 N.W.2d 652, 652 (1973) (per curiam) (denying defendant's postconviction petition where he had delayed bringing the petition for 25 years).[14] Adopting Carlton's interpretation of the Due Process Clause would require us to reverse the holdings in these cases. We decline to do so. Instead we reaffirm the principle from these cases that any right to review is not unlimited and, like other constitutional rights, can be forfeited and subjected to reasonable legislative limitations.[15]

**13.** Though we have often used language expressing "a commitment to convicted defendants' rights to at least one substantive review," *Butala v. State*, 664 N.W.2d 333, 338 (Minn.2003); *see also Stutelberg v. State*, 741 N.W.2d 867, 874 (Minn.2007); *Rairdon v. State*, 557 N.W.2d 318, 322 (Minn.1996); *Hoagland v. State*, 518 N.W.2d 531, 536 (Minn.1994), these decisions, when properly read in the context of a broad postconviction statute that had no time limits, are merely consistent with an attempt to provide defendants access to the fullest extent of postconviction process guaranteed under the statute.

**14.** These cases belie the dissent's contention that our court "in spite of the statute of limitations or other defect" has consistently "chosen to review the defendant's claim on the merits." Additionally, the cases cited by the dissent representing occasions when our court has reached the merits of a petition despite procedural bars do not support the dissent's ultimate conclusion that all criminal defendants have an unlimited right to one review of their convictions grounded in the Minnesota Constitution. Rather, these cases represent the rare occasions where we have exercised our discretion to hear appeals that were otherwise procedurally barred. The dissent cites only two cases—*Vang v. State*, 788 N.W.2d 111 (Minn.2010), and *Montanaro v. State*, 802 N.W.2d 726 (Minn.2011)—which deal directly with the time limits in the post-

conviction statute at issue here. Neither case supports the dissent's conclusion. In *Montanaro*, the postconviction court had explicitly found that the petition at issue was timely, but our court, for reasons of judicial economy, declined to express an opinion on timeliness and merely affirmed the postconviction court's rejection of the petition on the merits. 802 N.W.2d at 731–33. In *Vang*, we reviewed the merits of postconviction petition without determining whether it was timely because the case was "rare and exceptional ... both procedurally and substantively." 788 N.W.2d at 114. That our court has exercised its discretion in an exceptional case to grant review, does not, as the dissent suggests, indicate that the Minnesota Constitution as drafted guarantees every criminal defendant the unlimited constitutional right to our review of their conviction.

**15.** Other states that expressly provide a constitutional right to direct appeal of a criminal conviction have concluded that permissible limitations can be placed upon a constitutional right to appeal. In *Wood v. State*, the Nevada Supreme Court upheld against a constitutional challenge a fast-track procedure, which requires defendants to show some merit to their claims through a written statement prior to receiving the opportunity for a full appellate hearing on the merits. 115 Nev. 344, 990 P.2d 786 (1999). Even though the

We need not and do not decide whether the Due Process Clause of the Minnesota Constitution provides a right to one review, because even if such a right existed, the 2–year time limitation in subdivision 4(a) is a reasonable limitation. The 2–year time limit in subdivision 4(a) is subject to a range of exceptions in subdivision 4(b) that cover a variety of circumstances under which a defendant could seek to have his conviction invalidated. The interest-of-justice exception itself, through its examination of the degree of fault of the petitioner in any delay in proceeding with postconviction relief and of fundamental fairness considerations, makes it more likely that petitioners who are actively seeking to vindicate their rights to a review will be permitted to bring petitions even after the time limitation has expired. In short, Carlton has not demonstrated that the time limitation in Minn.Stat. § 590.01, subd. 4(a), is an unreasonable limitation on any due process right a defendant may have to review under the Minnesota Constitution. *See Bartylla,* 755 N.W.2d at 14 (noting that the party challenging a statute must demonstrate that the statute "is unconstitutional beyond a reasonable doubt"). We therefore hold that the time limit in Minn.Stat. § 590.01, subd. 4(a), is constitutional as applied to Carlton, because even if the Due Process Clause of the Minnesota Constitution provided Carlton a right to one review, the 2–year time limitation in subdivision 4(a) is a reasonable limitation on the alleged right.

Affirmed.

ANDERSON, PAUL H., Justice (concurring).

I concur in the judgment of the court, but I write separately to express my concern that the court writes too broadly in the course of deciding whether the State waived the time limits of Minn.Stat. § 590.01, subd. 4(c) (2010). I agree with the court that, in assessing the timeliness of Carlton's petition for postconviction relief in this case, we may consider Carlton's invocation of the interests of justice exception without first deciding whether the claimed exception meets the 2–year time limit of subdivision 4(c). The court correctly notes that the State does not argue, and has not argued, that Carlton's petition is barred by subdivision 4(c)'s time limit. The court also persuasively explains that neither the express language nor the legislative history of subdivision 4(c) shows the time limit to be a jurisdictional prerequisite incapable of waiver. But in my view, that is *all* that is necessary to decide the issue in this case.

I would not go on, as the court does, to offer general observations about the requirements and purposes of the postconviction statute. In the absence of briefing and concrete facts requiring our consideration of these subjects, I believe it is un-

Nevada Constitution guarantees a right of appeal in felony cases, the court disagreed with the defendant that "all defendants who have elected to stand trial are granted an unrestricted right to a fully-briefed appeal without having to make a preliminary showing of merit." *Id.* at 790–91. Rather the court determined that the right of appeal required only that "defendants have an adequate opportunity to present their claims within the adversary system." *Id.* at 791 (citing *Ross v. Moffitt,* 417 U.S. 600, 612, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974)); *see also Commonwealth*

*v. Morris,* 565 Pa. 1, 771 A.2d 721, 732 (2001) (explaining that "constitutional rights are not absolute and the legislature may place reasonable restrictions on constitutional rights," and concluding that "time limitations [on the right to appeal] provided a reasonable opportunity for those who have been wrongly convicted to demonstrate the injustice of their conviction, and thus, struck a reasonable balance between society's need for finality in criminal cases and the convicted person's interest." (citation omitted) (internal quotation marks omitted)).

wise for the court to opine on such complex and important matters. *Cf. Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 47 (Minn.1984) (refusing to decide an issue in the absence of an adequate record below, because it "would be tantamount to allowing the parties to submit hypothetical or speculative questions or to secure an advisory opinion"). For example, I would not speculate about the extent to which the postconviction statute codified and replaced preexisting remedies. And for many of the reasons stated in the concurring opinion of Justice Stras, I also do not think it appropriate or accurate to draw comparisons to the federal habeas statute, 28 U.S.C. § 2244 (2006), or to the cases recognizing equitable tolling of that statute's provisions.

Finally, I wish to note that, while I share Justice Stras's concern about the court's reliance on equitable tolling, I may not share his view on the availability of that remedy in an appropriate case. I believe that the interests of justice exception contained in Minn.Stat. § 590.01, subd. 4(b)(5) (2010), may be broad and flexible enough to permit the type of late filings that Justice Stras would conclude are prohibited. Ultimately though, I conclude that it is both unnecessary and inappropriate to define the full scope of the interests of justice exception or its relation to equitable tolling in this case. In essence, I would decide this case based on the language and history of Minn.Stat. § 590.01, subd. 4(c), and I would go no further.

STRAS, Justice (concurring).

I join the court's opinion, except its analysis of the doctrine of equitable tolling. I agree with the court's conclusion that the time restriction in Minn.Stat. § 590.01, subd. 4(c) (2010), is not a jurisdictional limitation. But I disagree with the court's reliance on equitable tolling in reaching that conclusion. I further disagree with the suggestion in the court's opinion that equitable tolling would apply in appropriate factual circumstances to revive an otherwise untimely petition for postconviction relief. I therefore write separately to express my view that the doctrine of equitable tolling is unavailable under Minn.Stat. § 590.01, subd. 4(c).

I.

Minnesota Statutes § 590.01, subd. 4(a), provides that "[n]o petition for postconviction relief may be filed more than two years after the later of" the entry of judgment or sentence or the disposition of a petitioner's direct appeal. Minn.Stat. § 590.01, subd. 4(a) (2010). A court, however, may consider a petition that otherwise does not satisfy the general 2–year time limit in subdivision 4(a) if the petition satisfies one of five exceptions in Minn. Stat. § 590.01, subd. 4(b) (2010):

(1) the petitioner establishes that a physical disability or mental disease precluded a timely assertion of the claim;

(2) the petitioner alleges the existence of newly discovered evidence, including scientific evidence, that could not have been ascertained by the exercise of due diligence by the petitioner or petitioner's attorney within the two-year time period for filing a postconviction petition, and the evidence is not cumulative to evidence presented at trial, is not for impeachment purposes, and establishes by a clear and convincing standard that the petitioner is innocent of the offense or offenses for which the petitioner was convicted;

(3) the petitioner asserts a new interpretation of federal or state constitutional or statutory law by either the United States Supreme Court or a Minnesota appellate court and the petitioner establishes that this interpretation is retroactively applicable to the petitioner's case;

(4) the petition is brought pursuant to subdivision 3 [which governs petitions from persons who were convicted and sentenced for a crime committed before May 1, 1980]; or

(5) the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice.

As the court explains, the five exceptions in subdivision 4(b) are subject to their own time limitation, set forth in Minn.Stat. § 590.01, subd. 4(c). Under subdivision 4(c), any petition invoking an exception under subdivision 4(b) *"must* be filed within two years of the date the claim arises." Minn.Stat. § 590.01, subd. 4(c) (emphasis added). For three reasons, I would conclude that equitable tolling of subdivision 4(c) is not permitted.

First, the plain and unambiguous language of subdivision 4(c) includes a mandatory directive that any postconviction petition invoking an exception *"must* be filed within two years of the date the claim arises." By using the auxiliary verb "must" in conjunction with the phrase "be filed" in subdivision 4(c), the statute contains a clear command that the filing requirement is mandatory and without exception. *See The American Heritage Dictionary of the English Language*

1160 (4th ed.2009) (defining "must" as "To be obliged or required by morality, law, or custom ... To be compelled, as by a physical necessity or requirement ... Used to express a command or admonition"). Construing the statute to incorporate equitable tolling would create an exception to subdivision 4(c) that does not exist. Put differently, permitting equitable tolling requires changing the text of subdivision 4(c) to say that a petition *"should* be filed within two years of the date the claim arises" or "must be filed within two years of the date the claim arises, *except when equitable tolling applies."* Because the Legislature did not adopt either of those alternatives, I would conclude that the plain, unambiguous language of subdivision 4(c) bars the application of equitable tolling. *See Larson v. State,* 790 N.W.2d 700, 703 (Minn.2010) ("If a statute is unambiguous, then we must apply the statute's plain meaning.").

Second, the language and structure of subdivision 4 as a whole reinforce my interpretation of subdivision 4(c)'s text. As stated above, the Legislature explicitly listed five exceptions to the general 2–year time limit in subdivision 4(a). In the *same* subdivision of the *same* statute, however, the Legislature did not include any exceptions to the 2–year time limit of subdivision 4(c). According to Minn.Stat. § 645.19 (2010), "[e]xceptions expressed in a law shall be construed to exclude all others." [1] Given that interpretive rule, we

---

1. The court relies extensively on *Holland v. Florida,* —— U.S. ——, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010), in suggesting that equitable tolling may apply to subdivision 4(c). In *Holland,* the Supreme Court concluded that 28 U.S.C. § 2244(d) (2006), which provides a 1–year statute of limitations for filing a habeas petition in federal court, is subject to equitable tolling. *Holland,* 130 S.Ct. at 2560. In reaching that conclusion, the Supreme Court relied on the "rebuttable presumption in *favor* of equitable tolling" of federal statutes. *Id.* (internal quotation marks omitted). Given the rule in Minn.Stat. § 645.19, however, Minnesota's postconviction statute does not

operate against a rebuttable presumption in favor of equitable tolling.

*Holland* is also distinguishable because 28 U.S.C. § 2244 does not include a provision similar to Minn.Stat. § 590.01, subd. 4(c), which contains mandatory language explicitly limiting the time within which a petition relying on an exception in subdivision 4(b) *must* be filed. Accordingly, unlike 28 U.S.C. § 2244, Minn.Stat. § 590.01 is "highly detailed" and "reiterate[s] its limitations several times in several different ways." *Holland,* 130 S.Ct. at 2561 (quoting *United States v. Brockamp,* 519 U.S. 347, 350–51, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997)) (internal quotation marks omitted).

must construe the Legislature's choice to provide express exceptions in one section of the statute as the implied exclusion of exceptions elsewhere in the statute. *See* 2A Norman J. Singer and J.D. Shambie Singer, *Statutes and Statutory Construction* § 46.7 (7th ed.2007) ("Where one section of a statute contains a particular provision, omission of the same provision from a similar section is significant to show different legislative intent for the two sections."); *see also Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 118 (Minn.2001) (citing the same point). It would therefore contravene legislative intent to read *any* exceptions into the clear and unambiguous language of subdivision 4(c). *See State v. Carufel*, 783 N.W.2d 539, 545 (Minn.2010) ("[T]he court cannot add words to a statute not supplied by the [L]egislature.").

Third, the *inclusion* of the interests of justice exception in subdivision 4(b)(5) provides evidence that the *exclusion* of equitable tolling was intentional. That is because the interests of justice exception and equitable tolling share a number of similarities. Both doctrines are equitable in nature and relief may be granted under each only in exceptional or extraordinary circumstances. *Compare Holland v. Florida*, —— U.S. ——, 130 S.Ct. 2549, 2562, 177 L.Ed.2d 130 (2010) (explaining that a habeas corpus petitioner is entitled to equitable tolling only if he diligently pursued his rights but was prevented from vindicating those rights by "extraordinary circumstances"), *with Gassler v. State*, 787 N.W.2d 575, 586 (Minn.2010) ("[W]e have only applied the interests of justice in exceptional situations."). Both doctrines also consider similar factors, such as a party's

diligence in asserting his or her rights. *See Holland*, 130 S.Ct. at 2562; *Gassler*, 787 N.W.2d at 586–87. Accordingly, to the extent the Legislature intended to provide an equity-based exception for untimely petitions, it did so by expressly adopting the interests of justice exception.[2]

## II.

For the foregoing reasons, I disagree with the court's reliance on the doctrine of equitable tolling in concluding that the time restriction in Minn.Stat. § 590.01, subd. 4(c), is not a jurisdictional limitation. I would conclude instead that the doctrine of equitable tolling does not apply to postconviction petitions filed under Minn.Stat. § 590.01.

PAGE, Justice (dissenting).

I respectfully dissent. The court's conclusion that persons convicted of a crime under state law in Minnesota do not have a constitutional right to at least one substantive review of their conviction is flawed. In this case, in which appellant has had no substantive review of his conviction, I find the court's almost casual disregard for its responsibility to ensure due process troubling! Our "unique" tradition of the right to one review, first articulated in *State v. Knaffla*, 309 Minn. 246, 251–52, 243 N.W.2d 737, 741 (1976), and subsequently applied in at least 13 instances, *see infra*, is a right protected by the Due Process Clause of the Minnesota Constitution. Thus, to the extent that Minn.Stat. ch. 590 (2010) precludes a defendant's right to our substantive review of his or her conviction, it is unconstitutional.

**2.** Unlike Minnesota's postconviction statute, the federal habeas statute, 28 U.S.C. § 2244, does not contain a list of exceptions to the 1–year time requirement for filing a habeas corpus petition, much less a specific exception resembling the interests of justice exception in subdivision 4(b)(5). Thus, unlike the

Minnesota Legislature, Congress has not displayed an intent in 28 U.S.C. § 2244 to include one type of equitable exception but to forego another. This fact further explains why the federal statute is not, as the court suggests, "analogous" to our own postconviction statute.

Both the United States and Minnesota Constitutions state that an individual may not be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7. While it is true that the United States Supreme Court has indicated that the United States Constitution does not guarantee a right to appeal under the Due Process Clause of the Fourteenth Amendment, *see McKane v. Durston*, 153 U.S. 684, 687, 14 S.Ct. 913, 38 L.Ed. 867 (1894), the conclusion that the United States Constitution does not guarantee one right of review is only the starting point for the analysis, not its conclusion. Indeed, if it was the end of the analysis, there would be no need for a similarly-worded provision in the Minnesota Constitution.[1]

We have long recognized the axiom that owing to our "duty to independently safeguard the rights of our citizens," *Kahn v. Griffin*, 701 N.W.2d 815, 828 (Minn.2005) (citing *State v. Carter*, 596 N.W.2d 654, 657 (Minn.1999); *State v. Harris*, 590 N.W.2d 90, 97 (Minn.1999); *O'Connor v. Johnson*, 287 N.W.2d 400, 405 (Minn.1979)), "we can and will interpret our state constitution to afford greater protections of individual civil and political rights than does the federal constitution." *Id.* (citing *Harris*, 590 N.W.2d at 97; *State v. Fuller*, 374 N.W.2d 722, 726 (Minn.1985)); *see Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (holding that state courts may reach conclusions based on their state constitutions, independent and separate from the United States Constitution); *see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 80–81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). "As the highest court of this state, we have said that we are and should be the 'first line of defense

for individual liberties within the federalist system.'" *Kahn*, 701 N.W.2d at 828 (quoting *Fuller*, 374 N.W.2d at 726; *Harris*, 590 N.W.2d at 97).

Historically, when independently interpreting the Minnesota Constitution, we have followed certain underlying principles. We have indicated that we will not construe our state constitution as providing more protection for individual rights than does the federal constitution unless there is a principled basis to do so. *Harris*, 590 N.W.2d at 97–98. We have also said that we will not lightly reject a Supreme Court interpretation of identical or substantially similar language. *Id.* at 98. Generally, we do not independently apply our state constitution absent language, concerns, and traditions unique to Minnesota. *Id.* at 97–98.

Our approach to interpreting the Minnesota Constitution has evolved over the years. "During the late 19th century and the first half of the 20th century, we took a cautious approach when interpreting our state constitution when presented with cases implicating the Due Process Clauses of the federal and state constitutions." *Kahn*, 701 N.W.2d at 825. "Approximately 40 years ago, we began to change how we view the use of United States Supreme Court precedent on issues implicating the Minnesota Constitution." *Id.* at 826. "This change was signaled by our decision in a case in which we interpreted the identical due process provisions of the federal and state constitutions." *Id.* In *State v. Oman*, 261 Minn. 10, 110 N.W.2d 514 (1961), we stated:

> When we apply our state due process clause, we are not bound to follow any interpretive relaxation of the inhibitions of the Fourteenth Amendment made by

1. Article 1, section 7 of the Minnesota Constitution was ratified in 1858, before the ratification of the Fourteenth Amendment of the United States Constitution in 1868. Thus,

there can be no question that the Minnesota tradition has its own unique history and trajectory. *Accord State v. Oman*, 261 Minn. 10, 21, 110 N.W.2d 514, 523 (1961).

the Supreme Court of the United States. We are bound by the decisions of that court as to what the due process clause of the Fourteenth Amendment prohibits; but, in interpreting our own clause, we are not bound to follow what that court says is not a violation of the Fourteenth Amendment. We should exercise our own judicial judgment as to what we deem a violation of our own constitution. 261 Minn. at 21, 110 N.W.2d at 522–23 (quoting *State v. Lanesboro Produce & Hatchery Co.*, 221 Minn. 246, 265, 21 N.W.2d 792, 800 (1946)). Subsequently, in *Fuller*, we said "a decision of the United States Supreme Court interpreting a comparable provision of the federal constitution that, as here, is textually identical to a provision of our constitution is of inherently persuasive, although not necessarily compelling, force." 374 N.W.2d at 727; *see also Kahn*, 701 N.W.2d at 826; *In re Welfare of B.R.K.*, 658 N.W.2d 565, 577 (Minn.2003); *Harris*, 590 N.W.2d at 97; *In re Welfare of E.D.J.*, 502 N.W.2d 779, 781 (Minn.1993); *State v. Hamm*, 423 N.W.2d 379, 382 (Minn.1988), superseded by constitutional amendment, *see Women of the State of Minnesota by Doe v. Gomez*, 542 N.W.2d 17, 30 n. 13 (Minn.1995). In *Kahn*, we recognized that "[s]ince the 1970's, our court, like most other state supreme courts, has exhibited a greater willingness to look to our state constitution when determining individual rights and liberties." 701 N.W.2d at 827; *see also id.* at 827–28 (collecting cases).

One of the situations in which we will be "most inclined to look to the Minnesota Constitution" is when we determine that our state constitution's language guarantees a fundamental right that is not enumerated in the United States Constitution, *id.* at 828 (citing *Skeen v. State*, 505 N.W.2d 299, 313 (Minn.1993)), or "if we determine that federal precedent does not adequately protect our citizens' basic rights and liberties," *id.* at 828 (citing

*State v. Hershberger*, 462 N.W.2d 393, 397–99 (Minn.1990)); *see Skeen*, 505 N.W.2d at 313–15; *Friedman v. Comm'r of Pub. Safety*, 473 N.W.2d 828, 830–32 (Minn. 1991).

With these principles and precedents in mind, I conclude that the Due Process Clause of the Minnesota Constitution entitles a person convicted of a crime to at least one substantive review of his or her conviction.

The Due Process Clause of the Minnesota Constitution is contained in article I, section 7. It provides, in relevant part, that "[n]o person shall be held to answer for a criminal offense without due process of law, ... nor be deprived of life, liberty or property without due process of law." Minn. Const. art. I, § 7. "Essential to the guarantee of due process is fundamental fairness." *State v. Melde*, 725 N.W.2d 99, 102 (Minn.2006).

Over the past 35 years, our court has demonstrated an historical commitment to the principle that, as a matter of fundamental fairness, a convicted defendant has a right to "at least one" substantive review. We first articulated this principle in *State v. Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741. In *Knaffla*, the defendant (Knaffla) was convicted of simple robbery. After the time for direct appeal expired, Knaffla filed a petition for postconviction relief under chapter 590. The postconviction court concluded that Knaffla had been denied a fair trial, but nonetheless believed it was compelled to deny postconviction relief because Knaffla had not first sought direct review of the conviction. *Id.* at 247, 243 N.W.2d at 738. We reversed the postconviction court and granted a new trial. We noted that Minn.Stat. ch. 590 was enacted as a legislative response to the United States Supreme Court's decision in *Case v. Nebraska*, 381 U.S. 336, 85 S.Ct. 1486, 14 L.Ed.2d 422 (1965) (per curiam), wherein the Court implied that "a convict-

ed defendant is entitled to at least one state corrective process to determine a claim of violation of federal constitutional rights." *Knaffla,* 309 Minn. at 251, 243 N.W.2d at 740. We further noted that in adopting chapter 590, the Legislature "expanded" upon the implications of *Case* because chapter 590 not only allowed postconviction relief when federal and state constitutional errors were alleged, but also upon a showing of a violation of state law. *Id.* at 251, 243 N.W.2d at 740–41. We concluded that the "salient feature" of chapter 590 "is that a convicted defendant is entitled to at least one right of review by an appellate or postconviction court." *Id.* at 252, 243 N.W.2d at 741; *see Deegan v. State,* 711 N.W.2d 89, 93 (Minn.2006) (recounting the same historical origins behind and purposes of chapter 590).

Since *Knaffla,* we have repeatedly reiterated our commitment to the principle that a person convicted of a crime has a right to at least one substantive review of his or her conviction by an appellate or postconviction court.[2] We have also, on numerous occasions, without expressly invoking this principle, reviewed the merits of appeals that were deemed untimely for one reason or another.[3] We have also

---

**2.** *See State v. Wallace,* 330 N.W.2d 458, 459 n. 1 (Minn.1983) ("We indicated in [*Knaffla*] that a criminal defendant is entitled to at least one right of review by an appellate court, and we believe that that applies even to misdemeanor convictions."); *Case v. State,* 364 N.W.2d 797, 799 (Minn.1985) ("[A] convicted defendant is entitled to at least one appeal to review claimed violations of the federal or state constitution or of state law." (footnote omitted)); *State v. Herem,* 365 N.W.2d 771, 772 n. 1 (Minn.1985) ("[W]e have recently reiterated that a convicted defendant is entitled to at least one review of claimed errors."); *Hoagland v. State,* 518 N.W.2d 531, 534 (Minn.1994) ("This court has made it clear that 'a convicted defendant is entitled to at least one right of review by an appellate or postconviction court.'" (citation omitted)); *Rairdon v. State,* 557 N.W.2d 318, 322 (Minn. 1996) ("[F]ailure to pursue a direct appeal is outweighed by our commitment to convicted defendants' rights to substantive review."); *Doppler v. State,* 660 N.W.2d 797, 802 (Minn. 2003) ("A convicted defendant is entitled to one right of review by an appellate or postconviction court."); *Butala v. State,* 664 N.W.2d 333, 338 (Minn.2003) ("[W]e have a commitment to convicted defendants' rights to at least one substantive review."); *McDonough v. State,* 675 N.W.2d 53, 57 (Minn.2004) ("*Knaffla* entitles a defendant 'to one right of review by an appellate or postconviction court.'" (citation omitted)); *James v. State,* 699 N.W.2d 723, 728 (Minn.2005) ("[I]n light of our case law, the facts of this case, and the fact that James has not had at least one substantive review of his case, we see, as we did

in *Butala,* 'no substantive basis for denying review of [James's] petition on the merits because of delay.'" (quoting *Butala,* 664 N.W.2d at 338)); *Spann v. State,* 704 N.W.2d 486, 491 (Minn.2005) ("[W]e have determined in Minnesota that 'a convicted defendant is entitled to at least one right of review by an appellate or postconviction court.'" (citation omitted)); *Deegan v. State,* 711 N.W.2d 89, 95 (Minn.2006) ("[B]ecause traditions unique to Minnesota may reflect a guarantee in the Minnesota Constitution, the right to one review of a criminal conviction [first recognized in *Knaffla*] may arguably be grounded in the Minnesota Constitution."); *Stutelberg v. State,* 741 N.W.2d 867, 874 (Minn.2007) ("[W]e have suggested that a petition cannot be barred as untimely where the petitioner has not been heard on appeal."); *Morris v. State,* 765 N.W.2d 78, 82 (Minn.2009) ("[A] convicted defendant is entitled to at least one right of review by an appellate or postconviction court." (citation omitted)).

**3.** *See Montanaro v. State,* 802 N.W.2d 726, 731–32 (Minn.2011) (assuming without deciding that defendant satisfied one of the time-bar exceptions in section 590.01, subdivision 4(b), and reviewing the defendant's claims on the merits); *Vang v. State,* 788 N.W.2d 111, 114 (Minn.2010) ("We need not and do not decide the postconviction statute-of-limitations issue because … we conclude that the exceptional and extraordinary circumstances of Vang's case warrant the exercise of our inherent authority to directly review the juvenile court's actions."); *State v. Hurd,* 763

repeatedly declined to decide whether the "right" we posited in *Knaffla* is rooted in the Minnesota Constitution. For example, in *Deegan*, we stated that "the right to one

review of a criminal conviction may arguably be grounded in the Minnesota Constitution," but we deferred that question until another day.[4]  711 N.W.2d at 95.

N.W.2d 17, 25 (Minn.2009) (considering the merits of defendant's claims, without deciding whether those claims were procedurally barred, "because [the defendant] was convicted of first-degree murder and sentenced to life imprisonment, because he has had no appellate review, and because determination of whether the interests of justice exception to the *Knaffla* bar applies itself contemplates some assessment of the merits"); *Spears v. State*, 725 N.W.2d 696, 701 (Minn.2006) (holding that although technically barred by *Knaffla*, defendant's claims had "substantive merit" and the interests of justice required review); *McMaster v. State*, 551 N.W.2d 218, 218 (Minn.1996) (determining that petitioner's claims lacked merit on the record despite 15–year delay in seeking postconviction relief); *Riggers v. State*, 284 Minn. 543, 543, 169 N.W.2d 58, 59 (1969) (per curiam) (affirming district court order vacating defendant's guilty plea after 33 years "to correct a manifest injustice"); *State ex rel. Holm v. Tahash*, 272 Minn. 466, 139 N.W.2d 161 (1965) (reviewing the merits of the defendant's claims despite the presence of a procedural bar); *State v. DeCloux*, 272 Minn. 94, 95–97, 136 N.W.2d 657, 658–59 (1965) (remanding case to district court for hearing so that defendant's claims could be reviewed on their merits even though the defendant's motion to vacate the judgment of conviction was procedurally barred); *State ex rel. Dinneen v. Tahash*, 272 Minn. 7, 13, 136 N.W.2d 847, 851 (1965) ("[C]onventional notions of finality of litigation may not stand in the way of review where an infringement of constitutional rights is alleged."); *State ex rel. Branchaud v. Hedman*, 269 Minn. 375, 376, 130 N.W.2d 628, 629 (1964) (considering the substantive merits even though the defendant's motion to vacate the judgment of conviction was procedurally barred, because the issue raised related to the asserted denial of due process under the Fourth and Fourteenth Amendments); *State v. Mertz*, 269 Minn. 312, 313–14, 130 N.W.2d 631, 633 (1964) (considering the merits even though the defendant's motion to vacate the judgment of conviction was procedurally barred); *State v. Pruitt*, 264 Minn. 243, 244–45, 119 N.W.2d 32, 34 (1962) (examining the record "to determine if there [was] any merit to the broad claims of the defendant that he

has been denied constitutional rights," despite the fact that the matter was "not properly before [the court] for review").

The court argues that "[o]n several occasions we denied postconviction petitions, even where the defendant had not taken a direct appeal, because of the defendant's delay in filing the petition." But in *McMaster*, we "thoroughly reviewed the record" and concluded that "none of the issues raised by McMaster's postconviction petition have any merit." 551 N.W.2d at 218. The commentary that followed on the petitioner's delay in filing was dicta, noted only after we decided his claims on the merits. And the other two cases cited are instances in which the criminal defendant waived the right to postconviction relief, one by failing to exercise "due diligence," *Gaulke v. State*, 296 Minn. 487, 487, 206 N.W.2d 652, 652 (1973) (per curiam) and the other in which the sheer length and potential mootness of the claim weighed against relief, *Houghton v. State*, 296 Minn. 494, 494–95, 207 N.W.2d 63, 64 (1973) (per curiam). As discussed herein, a criminal defendant may waive constitutional rights. *See infra.*

4.  Similarly, the court contends that it has not decided the broader constitutional question at issue. But in this case, the defendant raises that constitutional issue, claiming he never received a substantive review of his conviction; the State does not contend that he had a substantive review of his conviction, and the court is denying a substantive review of the conviction. Thus, by its action, the court can only be doing one of two things. Either it is deciding the constitutional question or it is ignoring its constitutional obligation. This is not a court that ignores its constitutional obligations. In all the cases cited herein, this court—in spite of the statute of limitations or other defect—has simply chosen to review the defendant's claim on the merits. By its action, the court's decision that criminal defendants do not have a right under the Minnesota Constitution to one substantive review of their conviction is as explicit as it gets. Therefore, the contention that the court is not deciding the issue is misleading at best.

That day is today.

Our concept of due process is not static; it is a progressive concept. " 'Due process' is, perhaps, the least frozen concept of our law—the least confined to history and the most absorptive of powerful social standards of a progressive society." *Griffin v. Illinois,* 351 U.S. 12, 20–21, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring); *see also McDonald v. City of Chicago, Ill.,* —— U.S. ——, 130 S.Ct. 3020, 3099, 177 L.Ed.2d 894 (2010) (Stevens, J., dissenting) ("[T]he liberty safeguarded by the Fourteenth Amendment is not merely preservative in nature but rather is a 'dynamic concept.' " (citation omitted)); *Bloom v. Illinois,* 391 U.S. 194, 212, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) (Fortas, J., concurring) ("It is the progression of history, and especially the deepening realization of the substance and procedures that justice and the demands of human dignity require, which has caused this Court to invest the command of 'due process of law' with increasingly greater substance."). "Due process, perhaps more than any other area of constitutional law, is a reflection of society's ever changing values and interests." David R. Schieferstein, Note, *The Death Penalty Cases: Shaping Substantive Criminal Law,* 58 Ind. L.J. 187, 205 (1982).

The scope of collateral relief from a criminal conviction has changed over time in Minnesota since the adoption of the Postconviction Relief Act in Minnesota in 1967. Act of May 10, 1967, ch. 336, § 1, 1967 Minn. Laws 517, 517–520 (codified as amended at Minn.Stat. ch. 590 (2010)). We recognized this evolution in *Deegan,* when we stated:

> Because a first review by postconviction proceeding in Minnesota is substantially similar to a direct appeal, and appears to differ from first review by postconviction proceedings in other jurisdictions, it may well be that the right to one review—through either direct appeal or postconviction proceeding—is a "tradition unique to Minnesota."

711 N.W.2d at 95. It is precisely because the right to postconviction review has become such an integral part of the Minnesota criminal justice system for finally adjudicating the guilt or innocence of a defendant that I conclude that it is an essential part of our evolving notions of due process of law.

Having concluded that the right to at least one substantive review of a criminal conviction is a right embedded in the Due Process Clause of the Minnesota Constitution, I also conclude that the time limits provided in Minn.Stat. § 590.01, subd. 4, are unconstitutional when, as here, they

It is worth noting that the court relies on *State v. Richardson,* 670 N.W.2d 267, 277 (Minn.2003), which holds that the constitutional right to present a defense is limited by the defendant's responsibility to comply with "procedural and evidentiary rules." *Id.* But the right to present a complete defense is different than the right to one substantive review of a conviction. As noted in *Richardson,* the purpose of requiring both the State and the criminal defendant to comply with procedural and evidentiary rules is to ensure "fairness and reliability in the ascertainment of guilt and innocence." 670 N.W.2d at 277 (quoting *State v. Richards,* 495 N.W.2d 187, 195 (Minn.1992)). The purpose of substan-

tive review is to make sure that the entire process was fair up to and including ensuring procedural and evidentiary rules are properly applied. *Richardson* is about the particular limits on one right, whereas the right to one review is about ensuring the panoply of rights were accorded to criminal defendants. In other words, absent the right to one substantive review, applying the court's logic in reliance on *Richardson* to a postconviction petition deemed untimely under Minn.Stat. § 590.01, subd. 4, the criminal defendant could be unfairly denied the right to present a complete defense—or the right to a jury trial, or the right to be free from a biased judge—and review would never be possible.

are applied to arbitrarily preclude a criminal defendant's right to our substantive review of his or her conviction.

My conclusion that the Due Process Clause of the Minnesota Constitution guarantees one substantive review of a criminal conviction does not necessarily lead to a conclusion that appellant here is entitled to have his conviction reviewed. We have consistently recognized that a criminal defendant may waive constitutional rights, even those deemed "fundamental." *See State v. Blom,* 682 N.W.2d 578, 617 (Minn. 2004); *see also State v. Givens,* 544 N.W.2d 774, 777 (Minn.1996) ("[I]t has long been settled law that courts will honor a defendant's lawful, 'intentional relinquishment or abandonment of a known right or privilege.'" (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938))). The rights that we have allowed defendants to waive are rights personal to the defendant and include the waiver of the right to trial entirely by pleading guilty, *see State v. Nordstrom,* 331 N.W.2d 901, 904 n. 6 (Minn. 1983); *Miranda* rights, *see State v. Ray,* 659 N.W.2d 736, 742 (Minn.2003); the right to counsel, *Blom,* 682 N.W.2d at 613; the right to a jury trial, *State v. McKenzie,* 532 N.W.2d 210, 217–18 (Minn.1995); and the right to be present at trial, *Brown v. State,* 682 N.W.2d 162, 166–67 (Minn.2004). We have recently recognized a defendant's right to waive the right to a direct appeal, subject to certain restrictions. *See Spann v. State,* 704 N.W.2d 486, 491–93 (Minn. 2005).

Waiver "is an intentional relinquishment of a known right or privilege, and its validity depends … upon the particular facts and circumstances surrounding the case." *State v. Richards,* 456 N.W.2d 260, 264 (Minn.1990) (citation omitted). A waiver, however, even of a constitutional right, need not be explicit. *Blom,* 682 N.W.2d at 617 (citing *Illinois v. Allen,* 397 U.S. 337,

342–43, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). "A court may imply a waiver from a defendant's conduct." *Id.* (citing *State v. Gillam,* 629 N.W.2d 440, 451–52 (Minn.2001)); *see also State v. Worthy,* 583 N.W.2d 270, 277–78 (Minn.1998) (holding that defendant's voluntary absence from courtroom constitutes a waiver of the Confrontation Clause right to be present at all stages of trial); *Spann,* 704 N.W.2d at 491 (concluding that a defendant can waive the right to appeal simply by not filing an appeal).

In the context of postconviction proceedings, we have long recognized that a defendant, by delay, may waive the right to postconviction relief. *See, e.g., Black v. State,* 560 N.W.2d 83, 85 (Minn.1997) (18-year delay); *Gaulke,* 296 Minn. at 487, 206 N.W.2d at 652 (25-year delay); *Jones v. State,* 288 Minn. 527, 529, 179 N.W.2d 315, 317 (1970) (per curiam) (16-year delay). We have emphasized, however, that delay is only one relevant factor in determining whether postconviction relief should be granted, and that only in "extreme cases" may delay alone justify denial of relief. *Butala,* 664 N.W.2d at 338 (citing *Rairdon,* 557 N.W.2d at 322). We have been especially careful, when considering a petitioner's delay, to honor our "commitment to convicted defendants' rights to at least one substantive review." *Id.* (nine-year delay did not preclude review on the merits) (citing *Rairdon,* 557 N.W.2d at 322); *Hoagland,* 518 N.W.2d at 536 (eight-year delay did not alone preclude relief); *Riggers v. State,* 284 Minn. 543, 543–44, 169 N.W.2d 58, 59 (1969) (per curiam) (33-year delay did not preclude relief). "Indeed, we have suggested that a petition cannot be barred as untimely where the petitioner has not been heard on appeal." *Stutelberg v. State,* 741 N.W.2d 867, 874 (Minn.2007). In *Black,* for example, we noted that although excessive delay can be a basis for dismissal, "[a]n exception to this rule is if

the petitioner never received a review of his case by an appellate court." 560 N.W.2d at 85. Likewise, we clarified in *Sutherlin v. State* that "[a] lengthy delay in filing a petition for postconviction relief may in itself provide a sufficient basis for affirming the dismissal of the *petition when there has already been a direct appeal.*" 574 N.W.2d 428, 432 (Minn.1998) (emphasis added).

It may well be that application of this principle of law, which has served our courts so well, for so long, would compel a conclusion that appellant has waived his right to one substantive review of the merits of his convictions. But in the absence of any consideration of that question by the district court, I express no opinion on the issue. I would reverse the judgments of the lower courts and remand for consideration of this question.